## McINTOSH

### v.

## PEOPLE OF THE VIRGIN ISLANDS

No. 5799

Circuit Court of Appeals

Third Circuit

March 13, 1936

*See, also, 83 F.2d 380*

MORRIS L. ERNST, New York City (NOLL & THIELE, St. Thomas, Virgin Islands, and MIGUEL GUERRA-MON-DRAGON, San Juan, Puerto Rico, of counsel), *for appellant*

NATHAN MARGOLD, Solicitor of U.S. Department of the Interior, Washington, D. C., JAMES W. MORRIS, Asst. Attorney General, JOHN J. PRINGLE, JR., and J. ALBERT WOLL, Spec. Assts. to the Attorney General, and GEORGE S. ROBINSON, St. Thomas, Virgin Islands, *for appellee*

Before BUFFINGTON, DAVIS, and THOMPSON, *Circuit Judges*

BUFFINGTON, *Circuit Judge*

■ At the threshold of this case, an appeal from a criminal conviction in the United States court in the Virgin Islands, we are confronted by a conflict between two branches of the United States government, to wit, the Department of the Interior and the Department of Justice. The Department of the Interior appears before us, by its Solicitor, and, confessing error, asks that the judgment below be vacated and the convicted man discharged. On the other hand, the Department of Justice appears by its Assistant Attorney General, and asks that if this court has jurisdiction in this appeal, the judgment below be affirmed. Both sides have been heard on this question of territorial control. In our judgment, we are

relieved from deciding that delicate question by the President of the United States, who has issued an executive order as follows: "The United States Court for China, the District Court of the United States for the Panama Canal Zone, and the District Court of the Virgin Islands of the United States are transferred to the Department of Justice." Exec. Order No. 6166, § 6, June 10, 1933, 5 U.S.C. §§ 124-132 note.)

This order establishes the control of the Department of Justice. Assuming, for present purposes, this court has jurisdiction over the appeal, we pass on to the merits.

In this case it appears that Leonard Walter McIntosh, hereafter called appellant, contends he was unjustly convicted and sentenced in the court below on three counts of an indictment charging him with violation of section 46, chapter 10, Title 4 (IV), of the Code of the General and Special Laws of the Virgin Islands for the Municipality of St. Thomas and St. John (1921; 14 V.I.C. § 834), which provides: "Every person who knowingly and designedly, by false or fraudulent representation or pretenses, defrauds any other person of money or property, is punishable in the same manner and to the same extent as for larceny of the money or property so obtained."

On entry of a judgment that he pay a fine of $200, he took this appeal.

A study of the record shows the appellant was chief clerk or chief bookkeeper of the local Department of Public Works. In the spring of 1934, he was building a house for himself and a public garage, and ran out of needed material. As he then owed the Lockhart Lumber Yard several hundred dollars and he was apprehensive it would not give him more credit, he resorted to getting the needed lumber from the Public Works Department of the Island. His method of doing so is thus stated by himself:

"My carpenters were working, I do not remember whether it was ceiling, the parlor or the dining room, and they ran out of ceiling lumber and as I had owed Lockhart quite a lot of money, I do not remember how much but around that time it was close to $700.00 or $800.00 and I could not see my way to keep on purchasing to make my house a bit more comfortable. The idea just struck me that why not get a couple hundred feet of ceiling lumber from the lumber yard and charge it to the Public Works Department. This I did in the following manner:

"I accordingly issued a requisition on Lockhart's Lumber Yard and sent a Requisition to the Lumber Yard.

"Q. By whom did you send the requisition? A. I do not remember. But I remember this that I called a truck, which driver's truck number I also do not remember, but I called a Government truck and sent it to the lumber yard and told them to fetch me that lumber from the lumber yard to my home. The quantity of lumber, I do not remember, but I do not think it was in excess of 500 feet — I do not think so. It was rush time, working night and day so I was hard-pressed.

"Q. This lumber, you say Mr. McIntosh, was ordered from Lockhart's Lumber Yard on a regular requisition form of the Public Works Department, and signed by you? A. Yes.

"Q. This lumber, however, never reached the Public Works Department, but went direct, according to your instructions, to your house via the Public Works truck. Is that correct? A. That is correct.

"Q. Mr. McIntosh, when did this happen? A. I cannot exactly remember the month. If you have any information I would appreciate your refreshing my recollection. (Mr. Baer then read to Mr. McIntosh the statement dated July 6, 1934, signed by Alphonse Callwood and remarked

621

that the time was about March of this year and after reading this statement Mr. McIntosh said Callwood was right, that he did tell him to wait at Judge Jensen's house for the truck.)

"Q. Is there anything else connected with it? A. I do not remember the date, but I should be able to determine that from the pay roll records. It may have been Ebenezer Degout [sic], because he is one of the Public Works drivers.

"Q. Mr. McIntosh, do you recall having Alfred Heidman, a driver for the Public Works Department, deliver to your house during about the month of March of this year, any cement? A. I do. He delivered, I do not know how many sacks, but more or less ten sacks of cement which cement was the property of the Public Works Department. Mr. Heidman received this cement upon my verbal instructions, he took it from the Public Works storehouse. This cement was used in my office. He did not receive the instructions from me.

"Q. Who from? A. He got the instructions from Reese.

"Q. Who told Reese? A. I told Reese."

It also appears that appellant, instead of using his own truck, had a government truck sent to the Lockhart Lumber Yard to get the lumber. He told his chauffeur to put the lumber under the house so no one would see it, and, to quote the words of the chauffeur, "He told me to go along with Ebenezer Dugout [sic] (the driver of the Government truck) and get the lumber and put it away because he got it from the Public Works." The lumber was used in building appellant's house.

Without going into details, the proofs also show he got nails and a considerable quantity of cement from the Public Works Department and told his chauffeur "to put it away so that nobody should see it." The proofs further show that the day after appellant's arrest, he came to

Mr. Baer, the then United States District Attorney, and said "he wanted to make a confession of the charges filed against him." The testimony of Baer is: "I told Mr. McIntosh immediately that he need not make any statement to me at all, that whatever he said to me may be held against him, and that he should employ counsel. Mr. McIntosh told me he did not want counsel. He said that what he wanted to do was to make a clean breast of everything; he wanted to tell me everything connected with the charges against him with reference to the Public Works Department." The appellant's statement was taken down stenographically and was produced at the trial, and is quoted above. For what happened subsequently, we quote from the brief of the Assistant Attorney General:

"The written confession was never completed. The appellant, in this statement of facts, states that the prosecution nowhere explains why McIntosh was never given an opportunity to complete it. Eli Baer, the Government attorney to whom the confession was made, stated (R. 54): I didn't take any further testimony from Mr. McIntosh because of instructions I received from the Secretary of the Interior. I was ordered to suspend my investigation for a while.

"Mr. Baer's connection with the Government was later severed, and he was replaced by George S. Robinson who, before conferring with any witnesses for the prosecution, stated to the trial judge informally that he desired to nolle prosequi the case against McIntosh (R. 15) and then later made a formal motion in open court for a nolle prosequi (R. 13)."

As noted above, the new District Attorney moved for leave to enter a nolle prosequi, which motion was refused, and thereupon the case went to trial; the appellant being represented by counsel who stated, "Ready for trial." The new District Attorney did not attend, and no objection

was made by appellant's counsel to his not being present. The situation was unusual, and the judge, being confronted by a situation where the District Attorney absented himself and did not act, and the former District Attorney having made the sworn-to information as to the offense with which the appellant was charged, we find no impropriety in the judge proceeding with the trial when the counsel for appellant stated they were "ready for trial." No exceptions were taken to the admission or refusal of testimony, and the evidence adduced, if believed, warranted a conviction of the appellant, who was denied no constitutional protection.

Upon careful consideration of all questions involved, we are of opinion the Court's judgment should be affirmed. The conduct of the judge in the trial of the case is strongly censured, but a study of the record satifies us that in this somewhat unusual situation the judge acted with fairness to the accused. He was represented by counsel, who expressed themselves as ready to proceed and who agreed the case was one which could be tried by the judge without a jury. No demurrer was filed, no motion made for a new trial or in arrest of judgment, and no exceptions were taken to any rulings of the judge, to his conduct, nor were any procedural questions raised before him. Notwithstanding the lack of exceptions and the existence of warrant for the appeal, we have carefully studied the record, and have reached the opinion that the proofs warranted a finding of the appellant's guilt. Not only was there a formal confession by him, but on several subsequent occasions he admitted to the then District Attorney his guilt. His own testimony, explaining away his previous admissions, the evidence of fellow employees that what he did was done by their consent, was given on his behalf; he was allowed postponements of his case; the money fine imposed was less than the money fine

and imprisonment that could have been imposed. And these are facts which show there was nothing of ill will, prejudice, or unfair conduct on the part of the judge. Without discussing in detail all of the questions here involved, all of which have had due consideration, we are of opinion the judgment below should be, and is, affirmed, and, in justice to the trial judge, we do not feel he acted as a prosecutor, but in accord with judicial duty and in keeping with the standards laid down in many cases.

DAVIS, *Circuit Judge* (concurring)

Two questions arise here: (1) The determination of the department under which the trial court operated; and (2) the fairness of the trial.

The President intended to transfer and did transfer the District Court of the Virgin Islands from the jurisdiction of the Department of the Interior to the Department of Justice. Thereafter, the Court with its officers functioned, and could only function, under the Department of Justice, and was free from any control whatever of the Department of the Interior. We heard the representative of the Department of the Interior at the argument of this case purely as a matter of courtesy, for as a matter of right and law it was a stranger to the proceedings and had no standing or proper place in the court.

The case was listed for trial, and the appellant, with his attorney, appeared before the court for trial. No question had been raised, nor has any since been raised, as to the regularity and sufficiency of the charges made against in the criminal information. The appellant was charged with committing a misdemeanor, and was tried before a court without a jury in accordance with the law of the Virgin Islands. When it was called for trial, the appellant's attorney answered that he was ready for trial, but the District Attorney, who had been instructed by

the Department of the Interior to have a nolle prosequi entered in the case, refused to appear. In this situation the trial judge had to decide whether or not he would stop the trial, or, with the consent or acquiescence of the appellant, proceed without the District Attorney. He chose the latter, and questioned the appellant concerning the charges against him. The questions asked were so fair and proper that appellant's counsel did not at any time raise a single objection or take a single exception. There was nothing unfair or prejudicial in the whole trial on the part of the judge in either manner or matter. He was calm, impartial, and simply tried to ascertain the truth.

On the entire evidence, that elicited by the judge and that elicited by appellant's attorney, there can be no real question about appellant's guilt. He was not denied a single right guaranteed to him by the Constitution or any law. A trial cannot be called unfair because the trial judge, in order to ascertain the truth, with the consent of the defendant, asks fair and proper questions.

Under the peculiar and unusual circumstances of this case, the trial cannot be called unfair, and the judgment should be affirmed.