PEOPLE OF THE VIRGIN ISLANDS

v.

LEANDER PRICE

No. 9943

United States Court of Appeals

Third Circuit

Argued February 14, 1950

Decided April 17, 1950

*See, also, 181 F.2d 394*

493

ALMERIC L. CHRISTIAN, Christiansted, Virgin Islands, *for appellant*

CROXTON WILLIAMS, Assistant District Attorney, Charlotte Amalie, Virgin Islands, *for respondent*

Before MARIS, MAGRUDER, and KALODNER, *Circuit Judges*

MARIS, *Circuit Judge*

This is an appeal by the defendant from his conviction in the District Court of the Virgin Islands of murder in the first degree and from the sentence of death imposed by the court pursuant to the recommendation of the trial jury. The homicide in question took place in the town of Chris-

tiansted, in the Municipality of St. Croix. The Code of Laws of that municipality, enacted by an Ordinance of the Colonial Council of St. Croix, approved June 15, 1920, provides, in (1921) Title IV, Chapter Five, (14 V.I.C. §§ 921 - 923), as follows:

"Section 1.—Murder is the unlawful killing of a human being, with malice aforethought.

"Section 2.—All murder which is perpetrated by means of poison, lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, burglary, robbery, or mayhem, is murder in the first degree, and all other kinds of murder are of the second degree.

"Section 3.—Every person guilty of murder in the first degree shall suffer death, or if there be extenuating circumstances shall suffer confinement in the penitentiary for life. Upon a plea of guilty the court shall determine the punishment. Upon a verdict of guilty the jury in the verdict shall recommend whether the punishment be death or imprisonment. Every person guilty of murder in the second degree is punishable by imprisonment in the penitentiary not less than ten years."

It was under the foregoing sections of the Code that the defendant was convicted of murder in the first degree and sentenced to death.

Upon this appeal he asserts that the verdict was contrary to the weight of the evidence and that it was accordingly error for the District Court to refuse to set it aside and to grant a new trial. He also contends that there was evidence of extenuating circumstances and that the jury accordingly erred in recommending that his punishment should be death. We shall first consider the latter contention.

As we have seen, Title IV, Chapter Five, Section 3 of the St. Croix Code provides for the punishment to be imposed upon a person guilty of murder in the first degree. That punishment is to be either death or imprisonment for life. Which punishment is to be imposed in a particular case is to depend upon whether there are extenuating circum-

stances. If such circumstances are found to exist the punishment is to be life imprisonment, otherwise it is to be death. If the defendant pleads guilty the trial judge determines whether extenuating circumstances exist and imposes punishment accordingly. But if the defendant enters a plea of not guilty it becomes the duty of the jury, if it finds the defendant guilty of murder in the first degree, to consider whether the evidence establishes the existence of extenuating circumstances. If the jury finds that there are extenuating circumstances in the case it is to recommend life imprisonment but if it finds that no extenuating circumstances appear it is to recommend death.

■ ■ Is a recommendation thus made by the jury conclusive as to the defendant's punishment? We think not. It will be observed that the Code lays down a legal standard by which the jury's action is to be determined. Its recommendation is required to be based upon its determination from the evidence that extenuating circumstances either do or do not exist in the case.[1] The existence of extenuating circumstances, however, is a matter which the trial judge is just as competent as the jury to determine.

■ ■ ■ It will also be observed that, whereas, in the case of a plea of guilty the Code provides that the trial judge shall "determine" the punishment, in the case of a verdict of guilty the jury is to "recommend" it. The use of the verb "determine" in the one case and "recommend" in the other cannot be without significance. To recommend is to present as one's advice or choice or as having one's approval.[2] It ordinarily involves the idea that another has the final decision. Here the recommendation of the jury is presented to the Court. The Code does not expressly direct

[1]It is thus clear that under the St. Croix Code the jury is not empowered to recommend the punishment which it thinks just or wise regardless of the existence or nonexistence of extenuating circumstances, as is the case under other statutes. Compare Winston v. United States (1899) 172 U.S. 303, 313, 19 S. Ct. 212, 43 L. Ed. 456.

[2]Webster's New International Dictionary, 2d Ed., Unabridged, p. 2080.

the Court to carry it out. The implication, therefore, is that it is the duty of the trial judge, to whom the recommendation is made, to determine and impose the appropriate punishment under the law. In making this determination the trial judge has before him the jury's recommendation and he must give it due weight. But he may also have before him facts derived from a presentence investigation which were not before the jury.[3] Moreover, he may disagree with the jury as to whether the evidence itself establishes extenuating circumstances. We hold, therefore, that in determining the appropriate punishment the trial judge must reach his own conclusion, upon all the facts before him, as to the existence of extenuating circumstances in the case. In reaching his conclusion he should give due consideration to the jury's recommendation but he is not bound by it. Accordingly if he concludes from all the facts before him that extenuating circumstances exist it becomes his duty to impose a sentence of life imprisonment even though the jury may have recommended death, while if he concludes that extenuating circumstances do not exist he must impose the sentence of death even though the jury may have recommended life imprisonment.

In the case before us the trial judge regarded the jury's recommendation as binding upon him and, therefore, did not exercise his own independent judgment with respect to the existence of extenuating circumstances in the case. The judgment of the court would, therefore, have to be vacated and the cause remanded for determination of this question by the trial judge and resentence accordingly if the jury's verdict that the defendant was guilty of murder in the first degree were permitted to stand. If, however, the verdict

[3]In considering the sentence to be imposed after conviction, the sentencing judge is not restricted to information received in open court but may also consider pertinent information developed upon a presentence investigation. Williams v. People of State of New York, 1949, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337.

itself must be set aside and a new trial granted the jury's recommendation will fall with it and need not be further considered.

We are thus brought to the principal question raised upon this appeal, namely, whether the verdict of guilty of murder in the first degree was so contrary to the weight of the evidence that it should be set aside and a new trial granted. Before passing upon the merits of this question we must first decide whether we have been given power to consider it. We accordingly proceed to consider the scope of our power of review.

■ The Acts of Congress which have conferred jurisdiction upon this court to review cases arising in the Virgin Islands are set out in a note.[4] Upon reviewing this legisla-

[4]Upon the acquisition of the Virgin Islands by the United States from Denmark in 1917 this court was given the right to review all cases arising in the Virgin Islands which would have been "reviewable by the courts of Denmark" prior thereto under the law in force in the islands. Act of March 3, 1917, ch. 171, § 2, 39 Stat. 1132, 48 U.S.C. § 1392.

In 1925 § 128 of the Judicial Code of 1911 was amended so as to provide that this court should have appellate jurisdiction to review final decisions in the District Court for the Virgin Islands "in all cases, civil and criminal, wherein the Constitution or a statute or treaty of the United States or any authority exercised thereunder is involved; in all other civil cases wherein the value in controversy, exclusive of interest and costs, exceeds $1,000; in all other criminal cases where the offense charged is punishable by imprisonment for a term exceeding one year or by death, and in all habeas corpus proceedings." Act of February 13, 1925, ch. 229, § 1, 43 Stat. 936. Whether the Act of 1917 was repealed by the Act of 1925 to the extent that the former granted the right of review in cases which were not covered by the Act of 1925 but which were formerly reviewable by the Courts of Denmark need not be considered. It may be noted, however, that while the Act of 1917 was not expressly repealed by the Act of 1925, § 13 did repeal "All other Acts and parts of Acts in so far as they are embraced within and superseded by this Act or are inconsistent therewith."

In 1928 § 128 of the Judicial Code was further amended so as expressly to confer upon this court jurisdiction to review the interlocutory orders and decrees of the District Court of the Virgin Islands which were specified in Section 129 of the Code. Act of April 11, 1928, ch. 354, § 1, 45 Stat. 422. In 1935 § 128 was again amended, this time to confer upon this court jurisdiction to review the final decisions of the District Court for the Virgin Islands in all criminal cases. Act of May 31, 1935, ch. 160, § 1, 49 Stat. 313.

By § 30 of the Organic Act of June 22, 1936, ch. 699, 49 Stat. 1814 (prec.

tion it appears that from 1917 to 1925 this court had jurisdiction to review all cases arising in the District Court of the Virgin Islands which would previously have been reviewable under the Danish law by the Courts of Denmark. From 1925 to 1938 we had appellate jurisdiction of final decisions of the District Court of the Virgin Islands in the cases specified in § 128 of the Judicial Code as it was amended from time to time and of certain interlocutory decisions of that court as specified in the Code. Since 1938 we have had jurisdiction of appeals from all final decisions of the District Court of the Virgin Islands as well as from the interlocutory decisions referred to in the Code. Thus we clearly have jurisdiction to review on appeal the defendant's conviction in the case now before us. Moreover by Section 2106 of Title 28 U.S.C., this court has power to "affirm, modify, vacate, set aside or reverse" the judgment of the District Court and to "remand the cause and direct the entry of such appropriate judgment, . . . or require such further proceedings to be had as may be just under the circumstances." But, except possibly for this requirement that the further proceedings directed to be

1 V.I.C.), 48 U.S.C. § 1406b, it was provided:

"Appeals from the District Court of the Virgin Islands shall be as provided by law in force on the date of enactment of this act; Provided, That no appeal shall be predicated upon the existence of a right of appeal under the law of Denmark."

It seems clear that the "law in force" referred to in § 30 was § 128 of the Judicial Code, as amended, in view of the proviso to § 30 which in effect repealed, if the Act of 1925 had not already done so, those provisions of the Act of 1917 which originally conferred upon this court jurisdiction to review all cases which could have been taken to the Courts of Denmark under the Danish laws.

In 1938 § 128 of the Judicial Code was again amended, this time to confer upon this court jurisdiction to review the final decisions of the District Court of the Virgin Islands in all cases without exception. Act of June 20, 1938, ch. 526, § 1, 52 Stat. 779. Finally the provisions of § 128 of the Judicial Code of 1911 were incorporated into §§ 1291, 1292 and 1294 of Title 28 U.S.C. as revised and enacted into law by the Act of June 25, 1948, ch. 646, § 1, 62 Stat. 929, 930. At the same time the provisions of § 2 of the Act of 1917 which originally conferred jurisdiction upon this court were expressly repealed. § 39, 62 Stat. 997.

had in the District Court shall be such as are "just under the circumstances", none of the relevant acts of Congress has prescribed or even suggested the scope of review which this court is to exercise in the cases from the Virgin Islands in which they confer jurisdiction upon it.

In a case arising under the laws of the United States and tried in the District Court of the Virgin Islands under its federal jurisdiction it may well be that the scope of our appellate review is the same as that which we ordinarily exercise in appeals from United States District Courts. The case before us, however, did not arise under a law of the United States. On the contrary it arose under the local law of the Virgin Islands, to wit, the Code of the Municipality of St. Croix. Section 2 of the Organic Act of 1917[5] provided: "That until Congress shall otherwise provide, in so far as compatible with the changed sovereignty and not in conflict with the provisions of this Act, the . . . local laws, in force and effect in said islands on the 17th day of January, nineteen hundred and seventeen, shall remain in force and effect in said islands, and the same shall be administered by the civil officials and through the local judicial tribunals established in said islands, respectively; and the orders, judgments, and decrees of said judicial tribunals shall be duly enforced."

Likewise Section 18 of the present Organic Act[6] provides: "The laws of the United States applicable to the Virgin Islands on the date of enactment of this Act, and all local laws and ordinances in force on such date in the Virgin Islands, not inconsistent with this Act, shall continue in force and effect: *Provided*, That the Municipal Council of Saint Croix and the Municipal Council of Saint Thomas and Saint John, and the legislative assembly, shall have power, when not inconsistent with this Act and within

[5]Act of March 3, 1917, ch. 171, § 2, 39 Stat. 1132, 48 U.S.C. § 1392.
[6]Act of June 22, 1936, ch. 699, § 18, 49 Stat. 1811, 48 U.S.C. § 1405q.

their respective jurisdictions, to amend, alter, modify, or repeal any law of the United States of local application only, or any ordinance, public or private, civil or criminal, continued in force and effect by this Act, except as herein otherwise provided, and to enact new laws and ordinances not inconsistent with this Act and not inconsistent with the laws of the United States hereafter made applicable to the Virgin Islands or any part thereof, subject to the power of the Congress to annul the same."

 It is plain that by these acts Congress intended to continue in force in the Virgin Islands the local law existing under Danish sovereignty, so far as compatible with the changed sovereignty and until changed either by Congress or by the local legislative bodies. Judicial procedure, including the scope of review upon appeal, was a part of the body of local law thus continued in force. Clen v. Jorgensen, 3 Cir., 1920, 1 V.I. 497, 265 Fed. 120. The Clen case was the first to reach this court after the change in sovereignty. One of the questions involved in that case was the scope of our review. We there pointed out that prior to the change in sovereignty an appeal was allowed from the district court to the Supreme Court of Denmark, in which court the whole record was reviewed de novo and we stated, 265 Fed. at page 124: "Therefore, until Congress shall provide otherwise, we shall regard the appellate jurisdiction conferred by the recited act [Act Mar. 3, 1917, ch. 171, § 2, 39 Stat. 1132; 48 U.S.C. § 1392] to be such as to enable this court to review on appeal all matters of fact and of law involved in the judgments brought here for review."

 While, as has already been noted, the provisions of the Organic Act of 1917 with respect to the jurisdiction of our court have been superseded by a series of subsequent Acts of Congress none of them has dealt with the scope of our review in cases arising under the local law of the Virgin Islands. Nor have any subsequent enactments of the

Municipal Council of St. Croix or the Legislative Assembly of the Virgin Islands been called to our attention which have dealt with the subject. It is obvious that in a case tried to a jury in the District Court appellate review could not take the form of a trial de novo, as appears to have been the practice under the Danish law. But there is nothing in our procedure which prevents a complete review on appeal of all disputed questions of fact. Nor, as we pointed out in the Clen case, is such broad review incompatible with the changed sovereignty of the islands. On the contrary, as Professor Orfield has pointed out,[7] it is in accordance with the more enlightened modern view, both in the United States and England, which grants an appeal on the merits as well as on questions of law. We, therefore, hold, in accord with our decision in Clen v. Jorgensen (supra), that under the local law of the Virgin Islands we have both the power and the duty to review matters of fact as well as of law which are involved in an appeal.[8] That this is especially so in the present case would appear from the provision of the St. Croix Code making an appeal mandatory in capital cases.[9] It is obviously the intention of the Code that no defendant's life shall be taken until after his case has been fully reviewed by the appellate court. We conclude that it is our duty in the case now before us to examine the evidence to determine whether it is sufficient, in our judgment, to make out a case of murder in the first degree beyond a reasonable doubt[10] and, if not, to direct a new trial in ac-

[7] Orfield, Criminal Appeals in America, 1939, ch. IV.

[8] We have heretofore exercised this power in other cases, when the occasion arose to do so. See e.g., McIntosh v. People of Virgin Islands, 3 Cir., (1936), 1 V.I. 618, 83 F.2d 380, 382.

[9] Code of Laws of the Municipality of St. Croix (1921), Title V, ch. 19, sections 12, 13 and 14 (5 V.I.C. § 3671 note). See Braffith v. People of Virgin Islands, 3 Cir., 1928, 1 V.I. 582, 26 F.2d 646.

[10] See People v. Crum, 1936, 272 N.Y. 348, 6 N.E.2d 51, in which the Court of Appeals of New York said: "A review of the facts means that we shall examine the evidence to determine whether in our judgment it has been sufficient to make out a case of murder beyond a reasonable doubt. We

cordance with the defendant's motion, which the district court denied. We turn, therefore, to a consideration of the evidence in the case.

The following facts are not in dispute. The deceased, Laurissa Petersen, aged 21 years, and the defendant, a laborer 24 years old, both of whom lived in Christiansted, had known each other casually for about three years. In August, 1948 Laurissa moved into a house near the defendant and shortly thereafter they became intimate and commenced living together although each retained a separate home. At that time Laurissa was unemployed and the defendant supported her for about two months. In November she secured employment in the country. This kept her out of Christiansted except on her days off but when she had free time she came to the defendant's home. On January 7, 1949 the defendant did not report for work but remained at home. Some time in the afternoon or early evening of that day Laurissa came to his house and later in the evening he killed her by stabbing her with a kitchen knife. After the killing he went to his sister's house, saw his niece in his sister's absence and told her that he had killed Laurissa. He then proceeded to police headquarters in Christiansted where at 8:25 P.M. he gave himself up to the authorities. On the way he met some acquaintances, told them that he had killed Laurissa and bade them goodbye, saying that he did not expect to see them again since he had gotten himself into trouble. Since these friends appeared to disbelieve his story he sought to emphasize its truth by taking off his shirt and cutting it with his pocket knife. At the police station he told the police officers that

are obliged to weigh the evidence and form a conclusion as to the facts. It is not sufficient, as in most of the cases with us, to find evidence which presents a question of fact; it is necessary to go further before we can affirm a conviction and find that the evidence is of such weight and credibility as to convince us that the jury were justified in finding the defendant guilty beyond a reasonable doubt." See also Orfield, Criminal Appeals in America, 1939, pp. 87-90.

he had just killed Laurissa, that they had had an argument and that she had given him some hard words. He also said that he had thrown the knife out of the house and told them where to look for it. The police thereupon went to his house, found the body of the deceased with three knife wounds in her chest and upon searching in the area indicated by the defendant found the knife with her blood still on it.

To establish that this admitted homicide was wilful, deliberate and premeditated on the part of the defendant, the People relied almost solely upon the testimony of two witnesses, Alfred Claxton and Uriah Williams, who were fellow employees with the defendant of the Christiansted Utilities Company. Williams testified that the defendant told them he thought that Laurissa was leaving him and was not coming back. Both testified that the defendant said that if Laurissa did leave him he would kill her, carry her out into the ocean in a boat and throw her into the sea with a ballast on her so that no one could find her. Claxton said that this conversation took place about the middle of December, 1948. Claxton also testified that the defendant was always speaking about killing someone, indeed, that during the three years that they worked together the defendant "was always making some awful threats every day."

There was also testimony by Williams that he had heard the defendant ask what poison was good to kill a human being and that he had a bottle of acid which he said he was going to use to kill rats. Claxton further testified that the defendant told him that sometime before December 15th he had attempted to poison Laurissa by putting poison in some eggs which she ate and as a result of which she had become sick. He admitted that the defendant had later denied this and had asked him how he could spread such a story. On the other hand Williams said that once when he

504

was at the defendant's house Laurissa complained that she had eaten some eggs which she had cooked which had made her sick. It was this testimony by Claxton and Williams as to threats by the defendant against Laurissa's life and as to a prior attempt by him to poison her upon which the People based their case that the admitted homicide was carried out by the defendant pursuant to a deliberate and premeditated plan to kill the deceased because she intended to leave him. If unrebutted and credited this evidence, it must be conceded, would be sufficient to sustain the verdict.

The testimony of the defendant presented a quite different picture, however. According to his evidence he was on the best of terms with Laurissa up to the very day of the killing. She visited him on her days off and spent the Christmas holidays with him less than two weeks before her death. At Christmas time he presented her with a wrist watch as a gift and he said that they had a fine time and parted the best of friends. During this whole period the only differences between them arose from the fact that every time Laurissa visited the defendant Williams would tell her tales about him. On January 6th he had overslept and so did not report for work on that day. He also stayed at home on the seventh since he had a headache and he spent most of that day in bed. Laurissa came to his house a little before four o'clock in the afternoon, wakening him up. She stayed a few minutes and then went to visit a neighboring seamstress who was doing some work for her. She returned later for a few minutes and then went away again, this time to get some food which he assumed she took to her own house. She returned for the third time at 23 minutes before eight, the defendant having observed the exact time by looking at the wrist watch which he had given her and which she was wearing. At this time she asked for her pen which she had left at his house and then

she told him that she had another man and she was leaving him.

The defendant testified that he thought at first that Laurissa was joking and he made a friendly gesture toward her but she rejected his advances, telling him that she had only pretended to love him to see what she could get from him. A struggle between them ensued for several minutes in the course of which they both fell to the floor beside a table on a lower shelf of which the defendant's kitchen knife was lying. The defendant noticed the knife and as he was getting up he snapped it up and struck Laurissa with it, inflicting the wounds from which she died. Realizing almost immediately what he had done, he threw the knife out of the house and with the thought of killing himself he picked up the bottle of rat poison which he kept in the house. Noticing that his hands were bloody he put down the bottle and went down to the sea to wash them. When he came back he could not find where he had put the rat poison so he decided that he might as well go to the police office. He then gave himself up in the manner which has already been described.

The defendant testified that while there had previously been talk with his fellow employees as to what he would do if his girl should prove unfaithful to him he had never made the threats to take her life to which Claxton and Williams testified and had never even entertained such a thought. On the contrary, he said, he was very strongly attached to her. He also testified that while he did have rat poison in the house he had used it to get rid of the numbers of rats which infested the place and had never attempted to poison Laurissa with it. He admitted that on one occasion she had become sick after eating some eggs and sausage but said that she herself had bought and cooked them. This he said was the incident to which Claxton and Williams referred. The defendant produced two char-

acter witnesses who testified that the defendant had a good reputation as a peaceful, quiet man not given to violence. This, then, was the defendant's version of the homicide and if it is to be credited rather than the testimony of Claxton and Williams a case of wilful, deliberate and premeditated murder was not made out.

In determining, as we must upon this review, where the weight of the evidence lies certain facts assume significance. The first of these is the rather questionable character of the testimony of Claxton and Williams, particularly the statement of Claxton that the defendant had made daily threats to kill for at least three years. This, if true, could hardly be taken as involving serious threats but was much more probably merely an extravagant way of speaking. Premeditating murderers do not ordinarily discuss their plans in public. Then we observe that there was no direct evidence, but merely the inference to be drawn from these alleged statements of the defendant, that there were any difficulties between Laurissa and the defendant prior to January 7th. On the contrary the defendant's testimony is uncontradicted that so far as he was concerned their relations were entirely friendly prior to January 7th, and that in fact she had spent three days with him at Christmas time when he gave her a wrist watch. Although the defendant's house was located in a populous area in the town of Christiansted and Williams testified that he visited him and Laurissa there, the People produced no direct evidence to rebut the defendant's testimony as to his friendly relations with Laurissa and his gift to her. Nor was there evidence by the officers who subsequently examined Laurissa's body that she was not wearing the wrist watch as the defendant alleged. The fact thus unrebutted that the defendant's relations with Laurissa were so friendly at Christmas time, only eleven days before the killing, that he bought her a wrist watch, an article which he himself

did not possess, is very significant. For it indicates that the threats which Claxton and Williams testified the defendant had made before that time either were in fact never made or no longer expressed the defendant's state of mind toward Laurissa. Certain it is that he did not carry them out at Christmas time when he had opportunity to do so. A fortiori they did not represent his state of mind on January 7th.

Finally we have the significant fact of the defendant's conduct immediately following the killing. Instead of proceeding to carry out his alleged preconceived plan of taking Laurissa's body and depositing it in the ocean the defendant acted as one who had no plan whatever. Seeing Laurissa lying dead and realizing the enormity of his offense he made no attempt to hide the crime or escape its consequences but proceeded to give himself up to the authorities telling everyone whom he met on the way just what he had done. This was certainly not the conduct of one who had deliberately planned and carried out a murder in cold blood.

■ Having given the case long and serious consideration it is our judgment that the weight of the credible evidence does not establish beyond a reasonable doubt that the defendant was guilty of a deliberate or premeditated murder. The verdict of guilty of murder in the first degree and the sentence of death which the court imposed thereon upon the recommendation of the jury, therefore, cannot stand.

Accordingly the judgment of the District Court will be reversed and the cause will be remanded to that court for a new trial.