**RED HOOK MARINA CORP., Plaintiff**

v.

**ANTILLES YACHTING CORP., Defendant**

Civil No. 216-1971

District Court of the Virgin Islands

Div. of St. Thomas and St. John

October 8, 1971

LOUD & CAMPBELL, ESQS. (ROGER CAMPBELL, of counsel), Charlotte Amalie, St. Thomas, V.I., *for plaintiff*

GRUNERT & STOUT (RICHARD E. GRUNERT, of counsel), Charlotte Amalie, St. Thomas, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

## OPINION

On April 8, 1969, plaintiff, by warranty deed, sold and conveyed parcels Nos. 50-A and 101 of Estate Frydenhoj, No. 3 Red Hook Quarter, to defendant. One of the parcels, No. 101 borders on the Caribbean Sea. In his action, plaintiff sues for foreclosure of the purchase money mortgage, and to recover the balance due on the underlying note. Defendant admits execution of the note and mortgage and its default thereunder, and counterclaims for breach of warranties of title and seizin. The case is presently before the Court on plaintiff's motions for summary judgment and for the dismissal of defendant's counterclaim. Also now before the Court is defendant's motion to join the Government of the United States and the Government of the Virgin Islands as parties on the ground that they claim right to a portion of the property conveyed to it.

Plaintiff is entitled to judgment on its note unless defendant has pleaded a defense raising a material issue of fact for trial.[1] Under proper circumstances, a counterclaim may be treated as the defense of set off, and I assume, for purposes of this opinion, that defendant's counterclaim would be a defense to the action on the note.[2] Defendant has asserted no other defense in his pleading.[3] Accordingly, both the motion for summary judgment and the motion to dismiss turn on the same issue, i.e. whether defendant has averred a valid counterclaim. Since matters outside the pleadings have been re-

---

[1] 11A V.I.C. § 3-307(2); Federal Rules of Civil Procedure.

[2] See Federal Rules of Civil Procedure 8(c).

[3] At the hearing on these motions, defendant stated that it was relying upon the defense of failure of consideration. However, this is an affirmative defense required to be set forth in the pleading, which defendant has not done. Fed. R. Civ. P. 8(c). Subsequent to the hearing, counsel for defendant filed a supplemental memorandum in which he made request for leave to amend under rule 15(a) to add this defense. Since any issues that might have been raised by this defense are dealt with in the remainder of this opinion, and also because of the apparent want of merit in such a defense, the request for leave to amend will be denied.

ceived on this issue, defendant's motion to dismiss will be treated as a motion for summary judgment.[4]

The basis for defendant's counterclaim lies in the purported affirmation of right by the Governments of the Virgin Islands and the United States to property seaward of the mean high watermark. Defendant states in its pleadings that such a claim is inconsistent with the descriptions in the deed conveyed by plaintiff and constitutes a breach of the warranties of title contained in that deed. Plaintiff argues, and has cited authority in support of its argument,[5] that no cause of action may lie on a breach of warranty of title until the buyer has lost possession of the property by way of either constructive or actual eviction. Defendant has made no assertion of eviction either by way of pleading or affidavit. At the hearing on these motions, defendant suggested that some official claim of right has been made by both Governments, but this was unsupported by affidavit or other proof.

Defendant also pointed out at the hearing that the deed contains a warranty of seizin. It cites the generally recognized rule that suit may be brought on a breach of warranty of seizin although the buyer remains in possession.[6] The issue raised by the cases treating the question is whether substantial or only nominal damages may be recovered for the breach.[7] In either event, it is generally accepted that a suit is properly maintained where a buyer in possession relies upon a warranty of seizin.

▮ Plaintiff suggests that defendant has not raised the defense of warranty of seizin in its pleadings. It appears to the Court, however, that under a liberal interpretation of the pleadings, the warranty of seizin contained in the

---

[4] Fed. R. Civ. P. 12(c).

[5] E. G. Greenwood v. Robbins, 108 N.J. Eq. 122, 154A 333 (1931).

[6] Hilliker v. Rueger, 228 N.Y. 11, 126 N.E. 266 (1920).

[7] Annotation 61 A.L.R. 42, Supplemented in 100 A.L.R. 1194.

deed could fairly come within the general term "warranty of title" used in defendant's pleadings, and I hold, therefore, that the defense and counterclaim, depending upon a breach of this warranty of seizin, is properly pleaded.

The question remains whether there is any issue of fact related to the defense and counterclaim. Defendant asserts breach because of the Governments claim to submerged land below tidewater. The deed contains a reference to a metes and bounds description which was attached to defendant's answer. This document described the seaward boundary of the conveyed premises here in issue as follows:

South 21 degrees 44 minutes West along portion of Estate Frydenhoj a distance of 294 feet, to the sea; thence turning

Along the sea in a general northwesterly direction a distance of 470 feet, more or less, to a point; thence turning

In determining whether the deed description includes property of the United States or the Virgin Islands within the boundaries of the conveyed parcel, I will discuss first the tidal boundary between public and private property and second, the proper interpretation of the deed description "the sea."

It should be stated at the outset that the defendant has framed its claim of breach of warranty around the single issue, the shoreline. No mention has been made of accretions[8] or of the right the public may have acquired in property above tidewater through dedication, custom, prescription or otherwise.[9] Due to the procedural posture of this case, the Court need not adjudicate all of the rights between the respective governments and landowners. I

---

[8] Cf. Burns v. Forbes, 7 V.I. 256, 412 F.2d 995 (3rd Cir. 1969).

[9] See e.g. Gion v. City of Santa Cruz, 84 Cal. Rptr. 162, 465 P.2d 50 (1970); State ex rel. Thornton v. Hay, 462 P.2d 671 (Or. 1969).

may decide only the issue properly before the Court on this motion for summary judgment, i.e. whether defendant has raised an issue of fact concerning the ownership of tideland property below mean high tide.

English and American common law has generally adopted the high watermark as the seaward boundary of private rights in tideland property. The Supreme Court has spoken to the issue on several occasions:

> By common law, both the title and the dominion of the sea and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high watermark, within the jurisdiction of the Crown of England, are in the King. Such waters, and the lands which they cover, either at all times, or at least when the tide is in, are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature. . . .[10]

> By the common law, the shore of the sea, and, of course, of arms of the sea, is the land between ordinary high and low watermark, the land over which the daily tides ebb and flow. When, therefore, the sea or a bay is named as a boundary, the line of ordinary high watermark is always intended where the common law prevails.[11]

█ █ A recent Federal enactment, apparently adopting this common law rule, presumed ownership by the United States of land located in the Virgin Islands, Guam and Samoa, "permanently or periodically covered by tidal waters up to but not above the line of mean high tide . . . ."[12] However, the rules of common law do not necessarily determine property relationships in the Virgin Islands. Anglo-American common law has been received into Virgin Islands jurisprudence only in relatively recent

---

[10] Shively v. Bowlby, 152 U.S. 1, 11 (1894).

[11] United States v. Pacheco, 69 U.S. 587, 590 (1865) (discussing a grant made under Mexican sovereignty).

[12] 48 U.S.C. § 1701(a) (1964).

241

times.[13] Therefore, property rights in the islands are rooted in the law existing while the islands were under Danish sovereignty, which law remained in force even after the transfer of sovereignty to the United States in 1917.[14] These rights were preserved after cession by treaty and generally understood rules of international law[15] and remained unaffected as well by the later adoption of common law.[16] Similarly, the United States succeeded to "all territory, dominion and sovereignty, possessed, asserted or claimed by Denmark in the West Indies"[17] including, of course, the rights of the Danish sovereign, either as owner or representative of the public, in the shoreline. The respective rights of the government and private owners in the shoreline could not be altered from the status quo in 1917 except pursuant to law. There has been no offer of proof that since 1917 there has been such

[13] The code of laws for the Municipality of St. Thomas and St. John (1921) contains the following provision in its Criminal Law title:
The common law of England as adopted and understood in the United States shall be in force in this district except as modified by this ordinance. Title IV, Ch. 13, § 6.
The counterpart Code for St. Croix contained an identical provision. The present code adopted in 1957 enacted a similar generally applicable provision. 1 V.I.C. § 4.

[14] See Williams v. Scrawder, 2 V.I. 241, 245 (D.V.I. 1952) (partition fence; "Danish law is still operative here").
People v. Price, 2 V.I. 492, 501, 181 F.2d 394 (3rd Cir. 1951) ". . . . Congress intended to continue in force in the Virgin Islands the local law existing under Danish sovereignty so far as compatible with the changed sovereignty and until changed either by Congress or the local legislative bodies").
Callwood v. Kean, 2 V.I. 526, 542, 189 F.2d 565 (3rd Cir. 1951) (Maris, J.) ("The Danish law in force when the island was one of the Danish West Indies remained in force, after the change of sovereignty, until July 1, 1921, when it was superseded by [the code] which substituted for the Danish law rules based upon the common law of England as understood in the United States").

[15] See Convention between the United States and Denmark, August 4, 1916, 1 V.I.C. p. 27, 39 Stat. 1706, T.S. 629, Art. 6; Cf. Act of March 3, 1917, ch. 171, 39 Stat. 1132. The rule of preservation of property rights upon change of sovereignty has been mentioned by the Supreme Court of the United States on many occasions. See Delassus v. United States, 34 U.S. (9 Pet.) 117, 133 (1835) and cases cited at Callwood v. Kean, supra. 542 n. 6.

[16] Callwood v. Kean, supra. 542 n. 6.

[17] Convention, supra. Art. I.

a change affecting the parcel here in dispute. Therefore, the Danish law, as it existed in 1917 will determine the boundary between public and private property for purposes of the motions under consideration in this case.[18]

The Danish rule as to the shoreline boundary between public and private property has evolved along similar lines as the common law rule, although the rights of the public to the use of the beach above high tide may be somewhat broader under Danish law.[19]

■ An 1884 case[20] involved a dispute between two fishermen and an owner of property known as Rosenvolds Fields which bordered on the sea. The fishermen had erected a winch on a beach claimed by the owner of Rosen-

---

[18] The law of Denmark was applicable to the then Danish West Indies. Colonial Law of April 6, 1906, § 67, 1 V.I.C. 22.

[19] It appears that the right of the public to access and use of the beaches above the high watermark was quite broad under Danish Law.

A Danish legal commentator has expressed his agreement with the statement of a Danish jurist that

. . . there has existed from olden times a right to make non-damaging use of the untilled beaches, and that this right, as a general rule, included the right to stay on the beaches for a shorter period of time (bathing, eating, playing and the like). Professor Flemming Tolstrup, "Strand-strandbred," in 1965 Juristen 31, 32.

A leading Danish text on property law states:

Beaches with high and low tides are under the sovereignty of the State, but they are otherwise open to the public for non-damaging use, such as traffic, bathing and the like. Kruse, 1 Ejendomsretten 332 (2nd ed. 1945).

A recent statute, based on previous Danish law and custom provides:

Beaches and other stretches of the coast which are without a continuous layer of turf or other inland vegetation are open to the general public for traffic on foot, for shorter stays, and for bathing. . . .

. . .

Untilled areas, to which there is access by a public road or footpath, or an otherwise lawful way, are open to the general public for traffic on foot and for short stays. Statute No. 314, June 18, 1969, §§ 54(1), 56(1). See generally the report of the Danish Royal Commission on the Conservation of Nature. Betaenkning om Naturfredning—Afgivet af den af Ministeriat for kolturelle anliggender under 23. November, 1961 nedsatte Naturfredningskommission (1967).

The Court is indebted to Finn Henriksen, Esq., European Law Division, Library of Congress for preparing and providing the Court with the above translations and the materials upon which the following discussion of Danish law is based.

[20] Advocat Halkier Aktor v. Peter Jacquett og Christian Hansen Moeller, 1884 Ugeskrift for Retsvaesen 443.

volds Fields and the owner sued. In holding in favor of the fishermen, the Court stated:

It cannot be established with certainty that the defendants at that particular day had been outside the part of the beach along Rosenvolds Fields, which not only in exceptional high water, but also usually or at least from time to time was flooded; this terrain, even if there could be found heaps of seaweed, above the water, could not be found to belong to the fields of Rosenvold.[21]

The Court in effect held that property that was "from time to time flooded" was part of the "farshore" or public domain. This called for a demarcation between public rights in the foreshore and private property rights in the upland. The Danish Supreme Court there stated:

To establish the landward boundary of the foreshore, the boundary which is here in question, a line must be drawn where the water normally reaches its highest level.[22]

This holding was apparently based upon the 1884 decision discussed above and purports to state the law as it existed in Denmark from that time.[23] It appears therefore that the Danish Law of 1917, and accordingly the law of the Virgin Islands, defines the seaward boundary of private property at the high watermark.

 I now turn to the interpretation that should be placed upon the boundary description "the sea" in the conveyance under consideration. A fundamental rule of construction of deeds is that a grantor is not presumed to intend to convey more than he owns. In Jennings v. Marston,[24] this rule was applied to a conveyance of land bordering on a river. The law of the state raised a rebuttable presumption of ownership in the abutting property

---

[21] The Court expresses its gratitude to Gudny M. Pedersen, Translator, Recorder of Deeds, St. Thomas, Virgin Islands for her translation of this passage and that quoted above.

[22] Lerup-Tranum Kommune v. Otto Jensen, 1941 Ugeskrift for Retsvaesen 504.

[23] See id. 504 n. 1.

[24] 121 Va. 79, 92 S.E. 821 (1917).

owner up to the thread of the stream where a deed referred to the stream as a boundary. In that case, the grantor did not own the land up to the thread of the stream. The Virginia Court held that where the true boundary was elsewhere, the deed would not be interpreted to convey more than the grantor owned. Similarly, the construction that this Court must place on the boundary description "the sea" should reflect the presumed intent of the grantor to convey only as much land as he actually owned.[25]

 As was concluded above, the plaintiff's property extended seaward no further than the ordinary high watermark. It must be presumed that plaintiff intended to convey no more.[26] Consequently, the ambiguous term "the sea" must be construed to refer to that line. Under this construction, no inconsistency appears between what plaintiff owned and what it conveyed to the defendant. The defense and counterclaim based on a breach of warranty of seizin therefore fail. Plaintiff is entitled to summary judgment. Defendant's motions are denied and its counterclaim dismissed.

---

[25] A rule of construction for conveyances in effect in the Virgin Islands provided:

When tidewater is the boundary, the rights of the grantor to low watermark are included in the conveyance. 28 V.I.C. § 47(5) (1957) as amended, Act No. 3063 § 3.

By its terms this provision is ineffectual where the rights of the grantor extend no further than the high watermark. As a rule of construction, only this provision has no effect on the actual tidewater boundary. Cf. Greaux v. Hatchette, 3 V.I. 360, 366–67, 164 F.Supp. 102 (D.V.I. 1958) (Biggs, J.) where this rule of construction was apparently given no effect, the court, adopting instead, without discussion, the familiar high watermark boundary.

The amending statute approved by the Legislature June 3, 1971, defines the public's right in the shoreline so as to include part of the beach above the high watermark. Accordingly, this statute is not presently under consideration by the court, assuming it were otherwise applicable to this case.

[26] At the hearing on this motion, defendant's counsel contended that the measurement contained in the metes and bounds description extends the seaward boundary far into the water beyond even the low watermark. This might raise a question of fact as to the intent of the grantor to convey more than he owned, if it had been set out in an affidavit as is required by Fed. R. Civ. P. 56. However, defendant has not made this assertion of fact by affidavit as is required and, therefore, it may not be considered by the court on this motion for summary judgment.