**CALLWOOD**

v.

**KEAN**

No. 10,310

United States Court of Appeals

Third Circuit

Argued January 29, 1951

Decided April 23, 1951

Rehearing Denied May 18, 1951

*See, also, 189 F.2d 565*

GEORGE H. T. DUDLEY, Charlotte Amalie, Virgin Islands, *for appellant*

C. G. THIELE *and* WILLIAM W. BAILEY, both of Charlotte Amalie, Virgin Islands, *for appellee*

Before MARIS, GOODRICH, and WOODBURY, *Circuit Judges*

MARIS, *Circuit Judge*

The plaintiff, Else E. Callwood, has appealed from the judgment entered by the District Court of the Virgin Is-

lands in a suit brought by her against the defendant, Osmond Kean, her former agent, for an accounting of his transactions as her agent and to recover certain mortgages and moneys in his possession which she alleges belong to her. The mortgages and moneys in controversy had been derived from the sale of certain real estate in the town of Charlotte Amalie, on the island of St. Thomas. The defendant, pursuant to a preliminary order of the court, furnished the plaintiff with an accounting and deposited the mortgages, other documents and check books in question with the clerk of the court. Thereafter Clifford W. L. Callwood intervened as a party defendant, with leave of court, claiming an interest in the real estate in question. The issue presented to the district court thereupon became one between the plaintiff and the intervening defendant and involved their respective rights in the proceeds of that real estate.

The plaintiff, Else E. Callwood, and the intervening defendant, Clifford W. L. Callwood, are the widow and son, respectively, of Richard Edgar Clifford Callwood, whom we shall call the testator. It was stated at bar that the testator was born in 1862 in Road Town, on the island of Tortola, one of the British Virgin Islands. At the age of 15 he came to the island of St. Thomas, then one of the Danish West Indies, to work for the Hamburg American Line. He soon became its wharf manager in which capacity he continued until his retirement in 1913. He married the plaintiff in 1905 and they had two children, a daughter Waldfriede born in 1906 and a son Clifford, the intervening defendant, born in 1908. Waldfriede married in 1934. She died on April 25, 1939.

It appears that during his residence in St. Thomas the testator purchased a number of parcels of real estate in Charlotte Amalie, one of which is the subject of this litigation. Title to that real estate was, however, taken in the name of his sister Anna Callwood who subsequently mar-

530

ried Jacob Peiffer. Upon his retirement in 1913 the testator and his family left St. Thomas and went to live in Germany. Previously, on April 25, 1911 he and his wife, the plaintiff, had executed a joint will in the presence of Wilh. Jacobsen, a Notary Public of St. Thomas, who recorded it at length in his protocol. The testator died at Biebrich on Rhine, Germany, on January 17, 1917. It appears that the notarial joint will which he and his wife had executed in St. Thomas was opened and published by the district court at Wiesbaden, Germany, on April 25, 1917 and filed with its records. The pertinent provisions of the will are set out in a footnote.[1]

Upon examining the will we see that, relying on a Danish Ordinance of 1845, the testator in paragraph 1 reserved the right, if survivor, to retain the whole joint estate of himself and his wife without dividing it with their children

[1] "Joint Will

\* \* \*

"No. 1.

"I Richard Edgar Clifford Callwood, reserve the right accruing to me as husband in accordance with Royal Ordinance of 21st of May 1845 Chapter 18, Section 1, say to retain, if I am the survivor our whole joint estate undivided with our joint children as long as I do not marry again.

"No. 2.

"I Richard Edgar Clifford Callwood, do hereby give and grant to my said wife, Mrs. Elsa E. Callwood, if she is the survivor, the same right as mentioned sub. No. 1 of retaining our joint estate undivided with our joint-children as long as she does not marry again.

"As however both of us consider it to be the benefit and welfare of all concerned, that the said right of retaining our joint-estate undivided should be given me, Mrs. Elsa E. Callwood, under certain restrictions I, Richard Edgar Clifford Callwood and I, Mrs. Elsa E. Callwood, do hereby decide, that the said right is given with the following restrictions:

"It shall be obligatory for me, Mrs. Elsa E. Callwood immediately at the death of my husband to deposit all cash-money, Bonds, Shares, and Securities belonging to the joint-estate and only to draw the interest of same. In case of unforseen events, which will make it necessary to withdraw the money or to make a change of the securities, this can only be done with the consent of Mr. Jacob Peiffer, living at Bieberick of Rhein, or in case of his death with the consent of Mr. Otto Zwanziger of Bieberick of Rhein or the person to whom the surviving of these gentlemen may transfer the said authority. It shall furthermore be obligatory for me, Mrs. Elsa E. Callwood, to pay every month the revenues which I receive to Mr. Richard Edgar Clifford Callwood's

and by paragraph 2 conferred the same right upon his wife, the plaintiff, if she should be the survivor. The will, however, further provided in that paragraph that the right of the plaintiff to retain the joint estate undivided should be exercised under certain restrictions, namely, that she was immediately upon her husband's death "to deposit all cash-money, Bonds, Shares, and Securities belonging to the joint-estate and only to draw the interest of same." It

Mother, Mrs. Caroline A. Callwood, as long as she lives, the amount of Thirty Dollars and to Mrs. Josephine W. Branson of New York as long as she lives the sum of Fifteen Dollars, these amounts to be paid the first time at the last day of the month after that in which Mr. Callwood's death has taken place and afterwards the last day in each month. If the amounts are not paid in due time the Legatees are entitled to claim in stead of the monthly amounts, annuities from a reliable life-insurance Company of respectively 360 Dollars and 180 dollars a Year. Finally, if Mrs. Elsa E. Callwoods retaining of our joint-estate should cease only 1/3 say one third part of our whole joint estate shall accrue to me, Mrs. Elsa E. Callwood, while the balance 2/3 say two third parts, shall accrue to our joint-children share and share alike, as their paternal inheritance.

"No. 3.

"The properties situated in the Town of Charlotte Amalie, St. Thomas, D. W. I., and which are recorded in Mrs. Peiffer's name, but of which the greater part belongs to us, viz:

Property No. 38 Dronningensgade and Qtr. — Half to Mrs. Anna R. Peiffer & half to C. Callwood.

Property No. 25 Norregade, Kgs. Ktr. — One third to Mrs. Anna R. Peiffer and two thirds to C. Callwood.

Property No. 36 Vestergade, Kgs. Ktr. One Third to Mrs. Anna R. Peiffer and two-thirds to C. Callwood.

Property No. 27D Norregade Kgs. Ktr. Belonging to C. Callwood.

Property No. 40A Taarnebjerg sub. No. 11 Ny, Kvtr. Belonging to C. Callwood.

Lot Number 40AA Haarnebjerg sub No. 11 Ny Kvtr. Belonging to C. Callwood,

| Property No. 19 | Norregade | Kgs | Kvtr. | Belonging | to | C. | Callwood, |
|---|---|---|---|---|---|---|---|
| Property No. 17 | Hospitalsline | Kgs | Kvtr. | ” | ” | ” | ” |
| Property No. 16 | Hospitalsline | Kgs | Kvtr. | ” | ” | ” | ” |
| Property No. 11D | Generalgade, | Krps. | Kvtr. | ” | ” | ” | ” |
| Property No. 11B | Generalgade, | Krps. | Kvtr. | ” | ” | ” | ” |
| Property No. 58 | Prindsensgade, | Kgr | Kvtr. | ” | ” | ” | ” |
| Property No. 59 | Prindsensgade, | Kgr | Kvtr. | ” | ” | ” | ” |

concerning these properties it is decided, that if Mrs. Elsa E. Callwood be the survivor Mr. Richard Edgar Clifford Callwood's sister, Mrs. Anna R. Peiffer shall after the death of Mr. Richard Edgar Clifford Callwood have the full use and benefit of these including the right to rent them out, with the condition, that she pays all taxes and fulfill all duties incumbent upon the owner

was further stipulated that "In case of unforseen events, which will make it necessary to withdraw the money or to make a change of the securities, this can only be done with the consent of Mr. Jacob Peiffer . . . , or in case of his death with the consent of Mr. Otto Zwanziger . . ., or the person to whom the surviving of these gentlemen may transfer the said authority." It was also provided that the plaintiff, if she survived, should pay certain annuities to

against the public, that she keeps the properties in proper repair and insured against fire in a reliable fire insurance company, the policies to be deposited as the cash money etc. mentioned in paragraph No. 2 and further that she pays a monthly amount of Dollars 15 unto Miss Iza Callwood at present at school in New-chatel, Switzerland, as long as both of them are alive. Finally it is a condition that Mrs. Peiffer as soon as possible after my death has the properties recorded in the name of Mrs. Elsa E. Callwood or if she is not taking possession of our joint-estate, as belonging to this, and that she has recorded as a servitude that they may only be sold or mortgaged with the consent of the gentlemen, keeping the power mentioned in Paragraph No. 2. If any of these conditions are not fulfilled for any of the properties, the expenses for the recording to be paid by the joint-estate, she is no more to have the use and benefit of that on these properties, and the gentlemen keeping the above mentioned power is to decide these questions, but if the monthly amounts for Miss Iza Callwood are not paid in due time she may claim an annuity of Dollars 180 a year from a reliable life-insurance company. If these properties should be sold or mortgaged or the fire insurance policies become due the cash proceeds are to be administered as the cash money etc. mentioned in paragraph No. 2 and the payments to Miss Iza Callwood to be continued for her life time from our joint-estate.

"No. 4.

"In case a division of our joint-estate should become necessary, the Legacies are to be paid by Mrs. Elsa E. Callwood and our joint-children proportionately to be the shares each of them should take; but if any of them should not wish to submit himself to this he shall be free to pay once for all the legaties 25 times the yearly amount, which else he should have paid, or to pay for them annuities in a reliable life-insurance company to the same amount as else he should have paid.

"The cash money paid in this way to Miss Iza Callwood or the policy bought for her to be administered as the cash money etc, mentioned in Paragraph No. 2.

"No. 5.

"Bank or Banks for depositing money, Bonds, Shares, Securities, and Policies are to be determined on the gentlemen keeping the power mentioned in Paragraph No. 2.

"No. 6.

"This our joint-will and testament is to be recorded in the Notary Publics Protokol and a copy from this is in all cases to be of same value and consequence as this original dokument. . . ."

Caroline A. Callwood, the testator's mother, and to Josephine W. Branson, his sister, during their lives. Neither of these two annuitants is now living. As has been said, the testator and his wife, the plaintiff, at the time of the death of the former in 1917 were residing in Germany and so far as appears the plaintiff thereupon took possession of their joint personal estate and dealt with it in accordance with the provisions of the will and the applicable law. We are not concerned with the personal estate in the present litigation, however.

What is of concern to us in this case is the disposition of No. 38 Dronningens Gade, Queen's Quarter, one of the parcels of real estate situate in the town of Charlotte Amalie, St. Thomas, which is dealt with by paragraph 3 of the will. That paragraph lists 13 parcels of real estate and recites that although the titles to all of them had been recorded in the name of Anna Peiffer, the testator's sister, "the greater part belongs to us". Specifically, the will recites that No. 38 Dronningens Gade, Queen's Quarter, was owned one-half by Mrs. Peiffer and one-half by C. Callwood, that No. 25 Norregade, King's Quarter, and No. 36 Vestergade, Queen's Quarter, were owned one-third by Mrs. Peiffer and two-thirds by C. Callwood. The remaining ten properties were recited as belonging to C. Callwood alone. Paragraph 3 further provides that if the plaintiff should be the survivor, Anna Peiffer should have the use and benefit of all these parcels of real estate for life upon condition that she pay an annuity to Iza Callwood during their joint lives and upon further condition that she "as soon as possible after my death has the properties recorded in the name of Mrs. Elsa E. Callwood or if she is not taking possession of our joint-estate, as belonging to this, and that she has recorded as a servitude that they may only be sold or mortgaged with the consent of the gentlemen, keeping the power mentioned in Paragraph No. 2."

534

Pursuant to the directions of the will and in accord with a written agreement signed by the plaintiff, Anna and Jacob Peiffer before a Notary Public at Wiesbaden, Germany, on April 26, 1924, Anna and Jacob Pieffer, by deed dated June 7, 1924, conveyed to the plaintiff the 13 parcels of real estate in Charlotte Amalie mentioned in paragraph 3 of the will. A life estate was reserved by the deed to Anna Peiffer, subject to the payment by her of the annuity to Iza Callwood as specified in the will, and with the proviso that the property could not be sold, mortgaged or otherwise disposed of without the consent of the "trustees" named in the will, Jacob Peiffer and Otto Zwanziger. The life estate thus given to Anna Peiffer by the will and confirmed by the deed was enjoyed by her during the remainder of her life and until her death on July 11, 1947. The annuity to Iza Callwood was settled by the payment of a lump sum to her in July 1923 by the plaintiff as contemplated by paragraph 4 of the will.

The defendant, Osmond Kean, was employed for nearly thirty years by Anna Peiffer as her agent for the collection of the rents and the management of these properties. On February 20, 1942 the plaintiff and the intervening defendant executed a power of attorney appointing Kean as their agent and attorney in fact to manage, lease and sell their real estate in the West Indies. It was stated at bar that in addition to the real estate in St. Thomas to which we have already referred, the testator was the owner of the Arendella and Cane Garden Bay estates on the island of Tortola as well as the whole of Great Thatch Island, all in the British Virgin Islands, which had been owned by his father, Richard Louis Callwood, who died intestate in 1902, and that Kean was employed by the plaintiff and the intervening defendant in managing these properties.

On May 20, 1946 Kean, as attorney in fact for the plaintiff and with her approval sold No. 38 Dronningens Gade

for the sum of $45,000. The deed to the purchaser was signed by Kean as attorney in fact for both the plaintiff and the intervening defendant.[2] The sale price of $45,000 appears from Kean's account to have been applied by him as follows:

| | |
|---|---:|
| To the payment of existing mortgages on the property | $ 3,960.21 |
| To commission and expenses of sale | 5,174.78 |
| To investment in mortgage loans to Paiewonsky and Beretta | 25,000.00 |
| To investment in 8/45ths undivided interest in No. 87 Kronprindsens Gade, Charlotte Amalie | 2,075.00 |
| To payments to, or for the account of, the plaintiff | 9,052.70 |
| To payments to the intervening defendant | 650.00 |
| | $45,912.69 |

The excess of these payments over the amount of the sale price was made up out of the sum of $3,000 received by Kean as payments on account of the principal of the Paiewonsky mortgage loans, leaving a balance of cash proceeds of the sale of No. 38 Dronningens Gade in his hands at the time he filed his accounting in the district court amounting to $2,087.31. This sum, together with net rents

[2]The deed contains the following provisions:
"That it is stipulated in grantor's title deed that the premises shall not be sold without the consent of the Trustees named in the will of the late husband of the party of the first part, Richard Edgar Clifford Callwood, to wit: Jacob Peiffer and Otto Zwanziger, which said two trustees both have died and that Wilheim Leverick Clifford Callwood, the son and only heir at law of the aforesaid Elsa Emma Callwood and her late husband Clifford (Richard Edgar Clifford Callwood aforesaid, has joined his mother in this deed).
"That Mrs. Anna Peiffer, the sister of the above named Richard Edgar Clifford Callwood, a resident of Germany, 86 years old, is entitled to the income from the property for her lifetime, and that the party of the first part shall and hereby guarantees that she will satisfy all claims arising out of said life interest."

collected by Kean for the plaintiff, appears to be on deposit in a bank account in the Virgin Islands National Bank at Charlotte Amalie styled "Osmond Kean in Trust for Elsa Callwood and C. W. L. Callwood." The investments which Kean made in the Paiewonsky and Beretta mortgage loans and in the 8/45ths undivided interest in No. 87 Kronprindsens Gade were taken in the names of the plaintiff and the intervening defendant jointly. All of the transactions with respect to the sale of No. 38 Dronningens Gade and the investment of the proceeds derived therefrom were carried out without the consent of Jacob Peiffer or Otto Zwanziger, the persons named in the will to exercise that power, Zwanziger having died on September 17, 1929 and Jacob Peiffer on February 18, 1942.

After Anna Peiffer, the life tenant, died on July 11, 1947, a question arose between the plaintiff and her son, the intervening defendant, as to their respective rights and interests in the mortgages, deed and cash in the hands of Kean, which, as we have seen, he holds in their joint names. The plaintiff thereupon revoked the authority of Kean to act as her agent and attorney in fact and, believing that she was entitled to possession of the mortgages, deed and cash in controversy, demanded that he turn them over to her and upon his refusal to do so instituted the suit now before us. As has already been stated, the district court made a preliminary order directing the defendant Kean to file an accounting of his transactions for the plaintiff and to turn over to the clerk of the court the mortgages and other documents held by him as agent, and this was done. Thereafter the court proceeded to consider the respective rights of the plaintiff and the intervening defendant. After full hearing the court filed an opinion in which it concluded:

"(1) That the defendant Osmond Kean has no interest in the property held by him, and should deliver any and all property

537

he may have, and submit an accounting to Mrs. Callwood, who still holds the whole joint estate, with her joint children;

"(2) That Intervenor, Clifford Callwood, has no possessory interest in the estate which his mother, plaintiff herein, now holds as trustee for herself and heirs, he being one of them. In the event his mother, the plaintiff, Else E. Callwood, should marry, the estate is to be divided as provided by the joint will;

"(3) That the Court should appoint someone in its discretion to take the place of the persons named in the will to whom the plaintiff may go in case of unforeseen events as provided in the will; and

"(4) That the proceeds of the sale of the property No. 38 Dronningens Gade, Queen's Quarter, together with the mortgage or mortgages which were taken thereon, should also be deposited in such bank as the said person named by the Court may determine."

The district court entered judgment in accordance with these conclusions and appointed D. Victor Bornn, of St. Thomas, as the successor of Jacob Peiffer, deceased, and Otto Zwanziger, deceased, as the person to exercise the authority conferred by paragraph 2 of the will. From this judgment the plaintiff has appealed. She contends that the court erred in deciding that the property in controversy does not belong to her outright and that the court was without power to appoint Mr. Bornn to exercise the power conferred by paragraph 2 of the will upon Jacob Peiffer and Otto Zwanziger.

While the questions raised in this case are common, at least in part, to all 13 of the parcels of real estate in the town of Charlotte Amalie which are dealt with by paragraph 3 of the testator's will, those questions are directed in this suit solely to the proceeds of the sale of No. 38 Dronningens Gade and the investments made by Kean out of those proceeds. There is no question as to the right of the plaintiff to the income from those investments nor as to her right to the rents of the other 12 properties. And

since those 12 properties have not yet been sold no question can be presently raised as to their proceeds.

In support of her claim to the proceeds of the sale of No. 38 Dronningens Gade the plaintiff relies upon the fact that legal title thereto was vested in Anna Peiffer and not in the testator at the date of his death. She also relies upon the agreement executed April 26, 1924, before a Notary Public at Wiesbaden, Germany, between herself and Anna and Jacob Peiffer and the deed from Anna and Jacob Peiffer to herself dated June 7, 1924 which was executed pursuant to the agreement. The agreement in question recited that three of the 13 properties dealt with in paragraph 3 of the will were only in part the property of the plaintiff and the testator and were in part the property of Anna Peiffer or the joint property of the Peiffers. The agreement went on to provide that all the properties should nonetheless devolve on the plaintiff as her exclusive property and that "In so far as this has not taken place through the testamentary disposition mentioned above, the husband and wife Peiffer hereby transfer all ownership and other rights, if any, owned by them in respect of the said real properties, to the party mentioned under A. [Else E. Callwood], who accepts, so that the latter becomes, in any event, the sole owner of all the above real properties or shares of real properties mentioned above." It was agreed that the parties concerned should take the necessary steps to transfer the properties in accordance with the law prevailing in St. Thomas. It was further provided in the agreement that Ann Peiffer should be entitled to a life interest in the whole of the 13 parcels of real property referred to in the will and the agreement and that upon her death her husband, Jacob Peiffer, should, if he survived her, be entitled to a life interest in No. 38 Dronningens Gade, No. 25 Norregade and No. 36 Vestergade to the extent to which his

wife, Anna Peiffer, owned undivided shares in those properties in her own right.[3]

The plaintiff's contention is that by virtue of this agreement and the deed which Anna and Jacob Peiffer executed and delivered to her pursuant to it she acquired an absolute title in fee simple to all 13 of the properties mentioned in paragraph 3 of the will subject only to the life estates reserved to Anna and Jacob Peiffer and free and clear of any interest of her husband's estate therein. She asserts that the proviso in the deed that the properties could not be sold, mortgaged or otherwise disposed of without the consent of the "trustees" named in the will created in reality a mere naked power which is void as involving an unlawful restraint on alienation and which in any event cannot be revived by an appointment by the court after the death of Jacob Peiffer, the surviving individual designated by the testator to exercise the power.

We do not think that the agreement and deed were intended to have the effect for which the plaintiff contends. For it is quite clear that the agreement was entered into, in part at least, in acceptance of the testamentary disposition made by the will of the testator and for the purpose of carrying it out. Indeed, the agreement, following a recital of the provisions of paragraph 3 of the will, contained an express statement to that effect, as follows: "Since it has now become certain, following the death of Mr. Richard Edgar Clifford Callwood, that his widow, the party mentioned under A., is the survivor, we, all the Appearers, have accepted the foregoing testamentary disposition of the Testator and are carrying it out as follows: . . ."

Likewise the deed which was executed pursuant to it contains an equally clear recital to the same effect.[4] And

---

[3]Since Jacob Peiffer did not survive his wife this life estate never took effect and accordingly does not concern us.

[4]"Know All Men By These Presents That I, Anna R. Peiffer, born Callwood, and ·I, Jacob Peiffer, her husband, for and in consideration of one (1)

if this were not sufficient to establish the fact, we need only point to the proviso already mentioned that the premises conveyed to the plaintiff cannot be sold, mortgaged or otherwise disposed of by her "without the consent of the trustees named in Mr. Callwood's above mentioned will".

██ Moreover the plaintiff signed the joint will which recited that the 13 parcels of real estate in Charlotte Amalie, although recorded in her sister-in-law's name, belonged in greater part to the testator and herself. She also signed the agreement of April 26, 1924, which likewise clearly recited the same fact. She cannot now be heard to assert to the contrary that the testator had no interest in these properties but that they belonged outright to his sister Anna Peiffer who conveyed the fee to her by the deed. We conclude that while the effect of the agreement and deed was to transfer to the plaintiff the legal title to these properties, nonetheless to the extent that Anna Peiffer had held that title for the testator the plaintiff took title to the properties in community with her deceased husband, the testator, and as part of their joint estate to be held by her under the provisions of their joint will. Furthermore we conclude that the provisions of that will and of the deed restraining the plaintiff from disposing of parcels of the joint estate without the consent of Jacob Peiffer or Otto Zwanziger were valid and effective in accordance with their terms and that the district court was fully empowered to appoint Mr. Bornn to act under the will as their successor in this capacity. We shall elaborate our reasons for reaching these conclusions.

 Since the will involves the title to real estate in St. Thomas it is to be construed in accordance with the

dollar to us paid, and in accordance with the directions contained in the last will and testament made and executed in St. Thomas on April 15, 1911 by the late Richard Edgar Callwood, and his wife Elsa E. Callwood, have granted and conveyed and by these presents do grant and convey unto Mrs. Elsa E. Callwood, the widow of Richard Edgar Clifford Callwood aforesaid, the real property known and described as: . . ."

rules of law in force in that island when the will went into effect on January 17, 1917, the date of the testator's death.[5] At that time the law in force in St. Thomas was that of Denmark. The Danish law in force when the island was one of the Danish West Indies remained in force, after the change of sovereignty,[6] until July 1, 1921 when it was superseded by the Code of Laws of the Municipality of St. Thomas and St. John which substituted for the Danish law rules of law based upon the common law of England as understood in the United States.[7]

[5]Restatement, Conflict of Laws:

"§ 248. SHARE OF SPOUSE IN LAND UPON TERMINATION OF MARRIAGE.

"(1) The existence and extent of a common law or statutory interest of a surviving spouse in the land of a deceased spouse are determined by the law of the state where the land is.

\* \* \*

"§ 249. WILL OF LAND.

"The validity and effect of a will of an interest in land are determined by the law of the state where the land is."

[6]The Danish laws locally in force in the Virgin Islands on January 17, 1917, when ratifications of the treaty of cession by Denmark to the United States were exchanged, remained in force until otherwise provided by Congress or by the Colonial Council having jurisdiction, pursuant to [ch. 171] Section 2 of the Act of March 3, 1917, 39 Stat. 1132 [prec. 1 V.I.C.], 48 U.S.C. § 1392.

Rights to property in St. Thomas which vested under the Danish law in force in that island prior to July 1, 1921 (see note 7 infra) were not affected by the change of sovereignty or by the substitution on that date of the rules of the common law. Soulard v. United States (1830) 4 Pet. 511, 29 U.S. 511, 7 L. Ed. 938; United States v. Percheman (1833) 7 Pet. 51, 32 U.S. 51, 8 L. Ed. 604; Strother v. Lucas (1838) 12 Pet. 410, 37 U.S. 410, 9 L. Ed. 1137; Leitensdorfer v. Webb (1857) 20 How. 176, 61 U.S. 176, 15 L. Ed. 891. Accordingly the rules of the Danish law in force when such rights to property vested define those rights today. United States v. Fullard-Leo (1947) 331 U.S. 256, 67 S. Ct. 1287, 91 L. Ed. 1474. As to the Virgin Islands those Danish rules are domestic, not foreign, law. Freemont v. United States (1854) 17 How. 542, 58 U.S. 542, 15 L. Ed. 241; United States v. Perot (1878) 98 U.S. 428, 25 L. Ed. 251.

[7]A Code of General and Special Laws for the Municipality of St. Thomas and St. John was enacted by an ordinance of the Colonial Council for St. Thomas and St. John which was approved March 17, 1921, and became effective July 1, 1921. Title II of the Code made provisions different from those of the Danish law with respect to the property rights of husband and wife, their interests in each other's property after death, their rights of disposition by will and the descent and distribution of real and personal

542

■ ■ Under the Danish law[8] from very early times husband and wife held their property in community,[9] unless otherwise provided by marriage settlement. Moreover one of the provisions of the Danish law was that upon the death of a spouse the surviving spouse could, under certain circumstances, continue to hold their entire joint estate in community until his or her death or remarriage, thereby postponing the rights of children or other heirs in the community property. This right appears to have been established by, and certainly was recognized by, the Ordinance of May 21, 1845 which was in force in the Danish West Indies. Section 18 of that Ordinance, referred to in the will here in question, provides that a husband after the death of his wife is not obligated to divide the property with their common children, whether they have attained their majority or not, so long as he does not remarry unless marriage contracts or other binding determinants create the necessity for such a division. The section further

property. The effect was to substitute a system based upon the common law in place of the community property system of the Danish law. Title IV, Chapter 13, Section 6, of the new code provided: "Section 6. The common law of England as adopted and understood in the United States shall be in force in this District, except as modified by this ordinance [1 V.I.C. § 4]."

[8] The court desires to acknowledge the great assistance it has received in this case from Dr. Lester B. Orfield, Professor of Law at Temple University, Philadelphia, in examining the relevant Danish statutes and texts and translating them into English for the use of the court. The court has also had the advantage of similar assistance from Dr. Vladimir Gsovski and Dr. Fred Karpf of the Foreign Law Section of the Law Library of Congress in Washington.

[9] Faurholt and Federspiel, Recent Danish Legislation on the Relation of Husband and Wife, International Law Association, Danish Branch, Copenhagen (1927), p. 9: "Christian V's Danish Statute Book of 1638 provided for community of property between husband and wife, but only the former was entitled to dispose of the joint estate, married women being under a legal disability in matters of property. Not until 1880 was a femme covert by law granted the right to dispose of what she earned by her own industry, and in 1899 she was invested with the same rights as a femme sole to dispose of property."

For an interesting description of the history and development of the law of Denmark, see Orfield, Danish Law, 5 Miami Law Quarterly (1950, 1951), 1, 197.

authorizes the husband by testamentary disposition to confer on his wife the same right to retain the whole property undivided. Section 19 of the Ordinance stipulates that the right of the surviving spouse to remain in community property as authorized by Section 18 ceases when the spouse remarries.[10]

It will be observed that the right thus given by the Danish law to a husband by his will to authorize his widow to remain in possession of their community property or joint estate was exercised by the testator here who, by para-

[10]Ordinance of May 21, 1845, Concerning certain changes in the Law of Inheritance, §§ 18, 19:.

"§ 18. En Mand er, efter sin Kones Dod, ikke pligtig at skifte med deres faelleds Bern, vaere sig myndige eller umyndige, saalaenge han ikke indlader sig i nyt Aegteskab, medmindre Aegtepagter eller andre gyldige Bestemmelser maatte medfere Nedvendigheden af et saadant Skifte. Ogsaa staaer det til Manden ved en testamentarisk Disposition at tillaegge sin Hustru samme Ret til at beholde det hele Bo undeelt. — Men i Mangel af en saadan Bestemmelse skal i Kjebenhavn Magistraten, og ellers Amtmanden; kunne indremme hende Tilladelse til i sin Enkestand at forblive hensiddende i skifftet Bo med hendes umyndige Bern, naar hun med paalidelige Attester godtgjor, at hun er en huuslig og forstandig Kvinde. — Denne Frihed kan ogsaa af bemeldte Ovrighed tilstaaes hende, uagtet der ere umyndige Stedbern, naar det, ifelge den fedte Vaerges Erklaering eller andet trovaerdigt Vidnesbyrd, kan antages, at hun tilberlgin vil serge for deres Underholdning og Opdragelse. — Enlige Frihed kan og under samme Betingelser indremmes den laengstlevende Mand med Hensyn til hans umyndige Stedbern. Hvad myndige Stedbern angaaer, da bliver den Laengstlevende pligtig at skifte med dem, medmindre de selv renuncere paa Skifte. Naar der, imedens den Laengstlevende Hensidder i uskiftet Bo, skulde tilfalde ham eller hende Noget ved en af Boet uafhaengig Adkumst, isaer ved Arv eller Gave, da skal den Laengstlevende vaere berettiget til at holde det saaledes Erhvervede udenfor Boet, under Betingelse af, at Skifte strax forlanges, inden det Erhvervede er indkommet i Boet.

"§ 19. Den i den foregaaende § omhandlede Ret for den laengstlevende Aegtefaelle, til at forblive hensiddende i uskiftet Bo, opherer, naar han eller hun indlader sig i nyt Aegteskab. . . ."

["§ 18. A husband is, after his wife's death, not bound to divide with their children, whether they are adult or minor, as long as he does not remarry, or by marriage-contracts or other binding determinants create the necessity for such a division. The husband also has the power by a testamentary disposition to confer on his wife the same right to retain the whole property undivided. But if there be no such determination the Magistracy in Copenhagen, or the governor of the county, may grant her permission in her widowhood to remain in community property with her minor children, if by honest attestations she shows that she is a frugal

graphs 2 and 3 of the will, expressly authorized his wife, the plaintiff, to retain the whole of their joint estate undivided and to the exclusion of their children until her remarriage. It appears that under the Danish law a surviving spouse who thus retained possession of the community property was entitled to sell or mortgage it or otherwise to deal with and dispose of it as absolute owner, although perhaps under a duty to compensate their children as heirs for any undue diminution in the aggregate value of their inheritance.[11] Accordingly if the testator here had not im-

and intelligent woman. This power may also by the above authorities be given her, although there are minor step-children, if according to the guardian's declaration or other reliable testimony, it can be ascertained that she will decently care for their support and upbringing. A similar power under the same provisions may be given to a surviving husband as to his minor step-children. As to adult step-children, the surviving spouse must divide with them, unless they themselves renounce a division. If there should occur, while the surviving spouse is continuing in community property, an independent claim to the property, especially as to inheritance or gifts, then the surviving spouse shall be entitled to withhold such acquisition outside the property, with the limitation that division be immediately demanded when the acquisition has come to the property.

"§ 19. The right of the surviving spouse, mentioned in the previous section, to remain in community property ceases when the spouse remarries."]

Samling af endnu gjaeldende Love og Anordninger m.v. af mere almindelig Interesse, udagiven efter Indenrigsministeriets Foranstaltning (Ved Justitsraad C. S. Klein), 1834-1848, Kjebenhavn, (1862).

[Collection of the now prevailing Laws and Ordinances of more general nature, handed down after the setting up of the Ministry for the West Indies (By Court Counsellor C. S. Klein), 1834-1848, Copenhagen (1862),] pp. 627-638.

[11]Faurholt and Federspiel, Recent Danish Legislation on the Relation of Husband and Wife, ibid. p. 13:

"Formerly the husband was entitled on the death of his wife, on condition that her other heirs were the issue of her marriage with him, to take over their former joint estate being then invested with the right of an owner till his own death or remarriage. The estate was then to be partitioned, one half being distributed according to the order of succession at the time of the wife's death, the other half as it was on the husband's death. Separate estate, however, always had to be distributed at once. The husband could by will confer the same right on his wife, but had he omitted to do so, she could only with the consent of the authorities remain in possession of the joint estate, and each child (resp. grandchild etc.) could claim liquidation of its portion on coming of age. With step-children a similar arrangement could be made, but in that case both husband and wife had to obtain official sanction. With collateral heirs,

posed upon the plaintiff the restrictions upon alienation to which we have already referred, and the validity of which we will presently discuss, she would unquestionably have had the right to sell, mortgage or otherwise dispose of the real estate in St. Thomas belonging to the joint estate of the testator and herself and also the right to take possession of and invest or otherwise dispose of the proceeds, being responsible at the most merely to compensate their children for any undue diminution, as the result of gifts made by her, in the value of their share of the joint

whose right is not indefeasible, only a will could provide a substitution with the same effect."

The former law appears to have been codified in this respect in the Danish Law of April 20, 1926, (see footnote 14 infra), section 6 of which provides:

"6. Den laengstlevende Aegtefaelle undever en Ejers Raadighed over de til Boet herende Midler.

"Hvis Aegtefaellen af Boet har bortskaenket en Gave, der staar i Misforhold til Boets Formue, og Gavemodtageren har eller burde have indset dette, kan enhver af Arvingerne kraeve Gaven omstedt, saafremt Sag til Gavens Omstedelse rejses inden 3 Maaneder efter, at Arvingen er blevet vidende om Gaven, og senest inden 1 Aar efter Gavens Fuld-byrdelse, og Boet ifelge en inden samme Tidsfrist fremsat Begaering tages under Skiftebehandling.

"Har Aegtefaellen ved Misbrug af sin Raadighed over Boet vaesentlight formindsket dette, kan Arvingerne, naar Faellesboet skiftes, begaere Vederlag derfor af det beholdne Faellsbo eller .i fornedent Fald for Halvdelen af det manglende Beleb af hans Saereje. Som Misbrug betrag-tes navnlig saadanne Retshandler, der gaar ud paa at skaffe Aegtefaellen selv foregede Indtaegter — f. Eks. Tegning af en uforholdsmaessig hej Livrente — eller tilsigter en Begunstigelse af den, med hvem Aegtefaellen er forlovet, eller af enkelte af Arvingerne."

["6. The surviving spouse exercises an owner's right over the estate.

"If the spouse has made a gift of a disproportionately large part of the estate, and the donee was or should have been aware of such disparity, an action to rescind the gift lies if proceedings are begun within three months of acquiring such knowledge by the heirs to set aside the gift and within a year after the transaction was performed and at the same time an application for immediate partition and distribution of the estate is lodged.

"If by abusing the right to dispose the spouse has materially reduced the value of the estate, the heirs, when the joint estate is divided, may claim compensation out of the remainder and if this is insufficient, then for half out of the surviving spouse's separate property. Instances of abuses are transactions purporting to increase the survivor's income as taking out a disproportionately large life-annuity, or showing favor to the survivor's betrothed or any particular heir or heirs."] Danmarks Love, 1665-1937, Copenhagen (1937), pp. 971-973.

estate upon her remarriage or death or the earlier division of the property.

The rights thus given by the Danish law to the surviving spouse who retains the joint estate in community cannot be described in terms of common law concepts since those rights are quite foreign to the common law. Specifically they cannot be described as those of trustee and beneficiary, as the district court suggested in its opinion. Nor is it necessary for us to attempt to classify them under the common law. It is sufficient to note the rights which the Danish law conferred upon a widow under these circumstances and to point out that these rights vested in the plaintiff upon the death of the testator with respect to the property in St. Thomas which they held in community, subject only to such restrictions as the testator by his will validly imposed upon her.

▆ At this point it becomes necessary to advert to another rule of the Danish law. Under that rule when a surviving spouse takes over the joint estate to the exclusion of the children, the joint estate consists not only of what was actually joint property at the time of the spouse's death but in addition all property which the surviving spouse later acquires to the extent that it would have been community property if it had been acquired during the marriage.[12]

[12]This rule also has been codified in the Danish Law of April 20, 1926 (see footnote 14, infra), Section 5 as follows:

"5. I det uskiftede Bo indgaar foruden Faellesvoet alt, hvad den laengstlevende Aegtefaelle senere erhverver, for saa vidt det vilde vaere blevet Faelleseje, hvis Erhvervelsen var sket under Aegteskabet.

"Arv eller Gave, som tilfalder den laengstlevende, indgaar dog ikke i det uskiftede Bo, saafremt Aegtefaellen begaerer Skifte inden 3 Maaneder efter, at han er kommet til Kundskab om Arvefaldet eller Gaven."

["5. Into the community property goes besides the joint estate all that the surviving spouse later acquires to the extent that it would have been community property if it had been acquired during the marriage.

"Inheritance or gifts, which accrue to the survivor, however, do not go into the community property, if the spouse demands a partition within three months of the acquisition coming to his knowledge."] Danmarks Love, 1665-1937, Ibid.

■ Under this rule the real estate in St. Thomas with which we are here concerned, to the extent that it belonged in fact to the testator, though held in the name of Anna Peiffer, must be regarded as a part of the joint estate and so treated when the legal title to it was subsequently acquired by the plaintiff by deed. For the testator in the will claimed this real estate as his own, except as to shares in three of the properties which he conceded belonged to Anna Peiffer. His claim of ownership was admitted by Anna Peiffer when she signed the agreement of April 26, 1924 and the deed of June 7, 1924. Unquestionably if Anna Peiffer had given a deed for this real estate in the testator's lifetime, as by his will he directed her to do after his death, the property would have become a part of the community property of the testator and the plaintiff. Therefore it must be regarded as having become such, when pursuant to his will, title to it was conveyed to his widow, the plaintiff. Accordingly, as to the testator's interest therein the plaintiff holds it as surviving spouse with the same rights in it as she would have had if legal title had been vested in him prior to his death.

■ As we have said, under the Danish law, a surviving spouse retaining possession of the community property is ordinarily entitled to sell or mortgage it or otherwise to deal with it as absolute owner. In the present case, however, as we have seen, the testator by his will placed definite restrictions upon the right of the plaintiff as surviving spouse to deal with the property. Thus he provided that it might only be sold or mortgaged with the consent of Jacob Peiffer or Otto Zwanziger and then only in case of unforeseen events which might make it necessary for the plaintiff to use principal or to make a change in the properties in which the joint estate was invested. Moreover he provided that she should deposit in banks to be designated by Jacob Peiffer or Otto Zwanziger all money and securi-

ties belonging to the joint estate, including the proceeds of the sale of any properties.

The plaintiff strongly urges that these restrictions made by the will and incorporated, so far as the restraint on alienation is concerned, in the deed to her, are invalid as constituting an unlawful restraint on alienation and that in any event the power conferred upon Jacob Peiffer and Otto Zwanziger was a personal power which lapsed with their death and which cannot lawfully be revived by the court through the appointment of another person to exercise it. In support of these contentions the plaintiff has cited numerous common law cases. However, we regard these cases as wholly inapposite since here again the question is to be determined by the Danish law which was in force in St. Thomas when the testator died. We, therefore, turn again to the consideration of that law.

It appears that under the Danish law a husband who by his will conferred upon his surviving wife the right to possession of the community property had also the right to stipulate that she could dispose of that property only with the consent of an individual who in Danish is called a "Tilsynsvaerge" which may perhaps best be rendered in English as "guardian". This concept of a guardian to advise a widow in the management of her property is very ancient in the Danish law,[13] and the concept developed in more recent times to the point that a husband was empowered to name such a guardian in his will if by that in-

[13] Code of Christian V, 1683, Book III, Chap. XVII, Articles 41 and 42:

"41. A widow shall choose one of her Relations, or any other Person of Probity, to be her Guardian; whose Advice she is to follow; and who, in Matters of Moment, shall subscribe jointly with her.

"42. If such Person, chose by a Widow, is litigious, and by his Conduct prejudices her Affairs, the Magistrate shall hinder her from following his Advice, and substitute in his Place some other Person of Prudence and Character."

The Danish Laws: or, the Code of Christian the Fifth. Faithfully Translated For the Use of the English Inhabitants of the Danish Settlements in America, London (1756), p. 193.

strument he authorized his widow to retain possession of their joint estate.[14] Accordingly when the testator named Jacob Peiffer and Otto Zwanziger in his joint will as persons whose consent was required to the sale or other disposition of the joint property by his widow he was exercising a right which the law then in force in St. Thomas gave to him. His appointment of these individuals successively to assume the duties of guardian for his widow was accordingly entirely valid. Under the Danish law a guardianship thus created was subject to termination by the appropriate court which might also on application of the

[14]This right on the part of the husband to designate a guardian to act with his surviving wife in the management and disposition of their community property was expressly provided for by the Danish Law of April 20, 1926, No. 120, which codified and revised the law concerning a spouse's right of inheritance and community property. That act, of course, was never in force in the Virgin Islands. Its provisions, however, appear to be to a great extent a codification of the previously existing Danish law which was in force in the Danish West Indies prior to 1917. Thus the noted Danish authority, Viggo Bentzon, who was chairman of the Danish delegates who participated in the drafting of the act, in Den Danske Arveret, Copenhagen (1931), pp. 55-56, states:

"Loven af 1926 har gennemfort principiel Ligestilling for Enkemanden og Enken med Hensyn til Adgangen til at hensidde i uskiftet Bo. En undtagelse fra Ligestilletheden betegner dog Reglen i L.s § 2, 2 Stk., 1. Pkt., hvorefter Manden ved Testamente kan bestemme, at Hustruen under sin Hensidden kun kan raade over Faellesboet med Samtykke af en Tilsynsvaerge, samt fastsaette, hvem der skal udfore dette Hverv. Reglen Stemmer med aeldre Praksisog er begrundet i den Gennemsnitsbetragtning, at Enken, isaer hvor Formuen er ret betydelig, og hun ingen Ovelse har vundet i at bestyre en formue, ofte vil traenge til en saadan Tilsynsvaerge, saavel i egen som i Arvingernes Interesse; disse Forhold vil derimod saare sjaeldent gaelde Enkemanden."

["The 1926 law has achieved a high degree of similarity as to the widower and widow with respect to the right to continue in community property. An exception to this similarity, however, is revealed in L.s § 2, 2. Stk., 1 Pkt., under which the husband can by will determine that the wife under her continuation can only manage over or dispose of the community property with the consent of a guardian, then appointed, who shall carry out this duty. The rule is in accord with the older practice, and is based on the consideration that the widow, especially where the estate is very considerable, and she has had no experience in managing an estate, often will need such a guardian, both in her own interest and in that of the issue; but this consideration would seldom apply to a widower."]

550

widow appoint another guardian for her if necessary.[15] The Danish law conferred this power upon the probate court. In the Virgin Islands the district court has the powers of a probate court. It follows, therefore, that the district court was empowered, in its discretion, to continue the guardianship by the appointment of Mr. Bornn as succeeding guardian for the plaintiff to execute the powers imposed upon the testamentary guardians, Jacob Peiffer and Otto Zwanziger, by the testator's will.

One further question must be considered. It will be remembered that with respect to three of the parcels of real estate in Charlotte Amalie, the testator claimed only undivided fractional interests therein and admitted in his will that his sister, Anna Peiffer, owned beneficially the remaining interest in those three properties. This was also recited to be the fact in the agreement of April 26, 1924 which the plaintiff and Anna and Jacob Peiffer signed. The interests thus owned beneficially by Anna Peiffer included a one-half interest in No. 38 Dronningens Gade, the property here particularly involved. We think that by the agreement of 1924 it was intended that the undivided interest thus beneficially owned by Anna Peiffer in No. 38 Dronningens Gade and the other two properties should be conveyed in fee simple to the plaintiff in her own independent right and not as surviving spouse in possession of the joint estate of the testator and herself. Accordingly

[15]Viggo Bentzon, Den Danske Arveret, ibid., p. 56:

"Efter denne kan Tilsynsvaergemaalet (for Hustruen) straks eller senere af Overovrigheden (med Rekurs til Justitsministeren) ophaeves, hvor det ikke, eller ikke mere, findes tilstraekkelig begrundet i Hensynet til Enkens eller Livsarvingernes Tarv. Skifteretten (i Kobenhavn Magistraten) kan ogsaa 'paa grundet Begaering' af Enken beskikke hende en ander Tilsynsvaerge."

["Under this provision the guardianship (for the wife) may immediately or later be set aside by the Upper Magistrate (with appeal to the Minister of Justice), if it is not now or does not continue to be sufficiently based on the needs of the widow or living issue. The Probate Court (in Copenhagen the Magistracy) may also on a reasonable demand of the widow provide her with another guardian."]

we hold that by the deed of June 7, 1924 which Anna and Jacob Peiffer executed pursuant to the agreement Anna Peiffer's undivided beneficial interest in these three properties was conveyed to and vested in the plaintiff individually. It is clear that Anna Peiffer's undivided interest had never been a part of the community property of the plaintiff and her husband in any sense and that when the agreement and deed were executed in 1924 the interest owned by Anna Peiffer individually was not subject to the Danish law, that law having been superseded in St. Thomas on July 1, 1921 by the rules of the common law.[16]

There remains only to consider the proviso contained in the deed of 1924 to the plaintiff that the premises conveyed thereby cannot be sold, mortgaged or otherwise disposed of by the plaintiff without the consent of Jacob Peiffer and Otto Zwanziger, the "trustees" named in the testator's will. The plaintiff contends that this restriction is void as a naked power which does not involve a trust but merely operates as an unlawful restraint upon alienation. We cannot agree with the plaintiff's contention so far as concerns the property which Anna Peiffer held for the testator and which the deed conveyed to the plaintiff as a part of the joint estate under the will. For as to this property the deed, as we have held, was intended merely to carry out the directions of the testator's will and the powers granted to Jacob Peiffer and Otto Zwanziger by the will were valid.

The question remains as to whether the restraint upon alienation involved in the proviso contained in the deed is valid as applied to the undivided beneficial interest of Anna Peiffer in No. 38 Dronningens Gade and the other two properties which, as we have held, the deed conveyed to the plaintiff as her own individual property. We do not reach this question, however, since we conclude that the

[16]See footnote 7, supra.

proviso was not intended by the parties to apply to this individual interest of the plaintiff and does not do so. We think it is clear that the proviso was intended to apply only to that interest in the properties acquired by the plaintiff under the deed which was part of the joint estate of the testator and herself and not to Anna Peiffer's beneficial interest therein which the plaintiff also acquired by the deed. For the proviso refers to Jacob Peiffer and Otto Zwanziger as trustees under testator's will. It was evidently included pursuant to the direction of paragraph 3 of the will that it should be "recorded as a servitude" when the conveyance was made by Anna Peiffer of the properties which she held for the testator. It was, therefore, we think merely intended to give Jacob Peiffer and Otto Zwanziger the same power which they had under the will. That power was, as we have seen, derived from the Danish law. Under that law the guardian thus appointed for a widow had nothing to do with her own independent separate estate.[17]

We are the more led to this construction of the proviso because of the fact that if it were to be construed as applicable to the interest which the plaintiff acquired individually by the deed from Anna Peiffer it would seem clearly to be against public policy and invalid as constituting an unlawful restraint on alienation.[18] For the guardian-

[17]Viggo Bentzon, Den Danske Arveret, ibid., p. 56:

"Tilsynvaergen har m. H. t. Midlerne i det uskiftede Bo ifolge L.s § 2, 2. Stk., 2. Pkt. aldeles gennemgaaende (ved ligefrem Henvisning til Paragrafferne i Myndhl.) faaet samme Befojelse og Stilling som en Lavvaerge ifolge Myndhl.s Kap. 6, jfr. Opregningen af §§ i denne Lovs § 56. Over sit Saereje raader hun uafhaengig af Tilsynsvaergen."

["The guardian has with respect to the effects in the community property, under L.s § 2, 2. Stk., 2. Pkt., completely (with like reference to the paragraphs in the Majority Law) obtained the same authority and position as a guardian with respect to minority under Chapter 6 of the Majority Law . . . § 56. Over her own independent separate interest she manages independently of the guardian."]

[18]Prey v. Stanley (1895) 110 Cal. 423, 42 Pac. 908; Muhlke v. Tiedenmann (1899) 177 Ill. 606, 52 N.E. 843; Battin v. Battin (1923) 94 N.J. Eq. 497, 120 Atl. 519, 521; Restatement, Property, § 406 and comment h; 41 Am. Jur., Perpetuities and Restraints on Alienation, § 66.

ship provided for by the testator in his will had nothing to do with that interest and we can find no authority for imposing such a restraint under the accepted rules of the common law. Indeed, both Jacob Peiffer and Otto Zwanziger being deceased and thus unable to consent, the restraint would now be absolute in view of the fact that the power of Mr. Bornn, the successor guardian appointed by the district court, does not under the Danish law from which he derives his powers extend to individually owned property of the plaintiff. We conclude, therefore, that the plaintiff is entitled to deal with and dispose of the undivided one-half interest in No. 38 Dronningens Gade and its proceeds, which she owns individually, free from any control by a guardian appointed by the testator's will or by the court.

It will be helpful at this point to summarize our conclusions. Upon the death of Anna Peiffer on July 11, 1947 the plaintiff became entitled to a one-half interest in the proceeds of the sale of No. 38 Dronningens Gade outright. Upon the happening of the same event she became entitled to the other one-half of the proceeds of the sale of No. 38 Dronningens Gade as surviving spouse entitled until her death or remarriage to hold the joint estate of her deceased husband and herself in community to the exclusion of their children, but subject to those provisions of the will which require her, so long as she holds the entire joint estate undivided, to deposit all cash and securities belonging thereto in a bank or banks to be determined by the guardian appointed for her by the court, and which permit her to withdraw principal funds or change investments only with the consent of the guardian so appointed.

The extent of the interest to which the plaintiff would be entitled, either as owner or as heir or devisee of her husband, in what remains of the joint estate upon her death or remarriage or the earlier division of the joint estate,

as well as the extent of the interest of the intervening defendant and the heirs of his deceased sister therein at that time, are matters which do not now concern us. They may well involve further difficult questions of the Danish law formerly in force in St. Thomas and we leave them for later decision if and when questions with regard to them arise. Nor are we directly concerned with the rights of the parties in the 12 other parcels of real estate situate in the town of Charlotte Amalie which are described and dealt with by paragraph 3 of the testator's will. Clearly the plaintiff is entitled to the income of these properties just as she is to the income of the mortgages and real estate purchased with the proceeds of the sale of No. 38 Dronningens Gade. Likewise it would seem that the rights of the parties in these 12 remaining properties will be determined by the same rules which govern their rights in No. 38 Dronningens Gade and its proceeds. It is sufficient for the disposition of this case to point out that the plaintiff is entitled to receive from the defendant Kean one-half of the proceeds of the sale of No. 38 Dronningens Gade, either in cash or securities, less any payments heretofore made to her, and that the other one-half must remain on deposit in a bank or banks designated by Mr. Bornn, the succeeding guardian, and subject to withdrawal or reinvestment only with his consent.

From what has been said it is clear that the intervening defendant has no present right in the proceeds of the sale of No. 38 Dronningens Gade and that he should assign and convey to the plaintiff the undivided interest in the mortgages and real estate purchased from those proceeds which defendant Kean as attorney in fact for the parties caused to be placed of record in his name.

We conclude that the judgment in this case should be in the following terms:

1. That the court appoints D. Victor Bornn of St.

Thomas as guardian [Tilsynsvaerge] for Else E. Callwood, the plaintiff, to succeed Jacob Peiffer, last surviving guardian named in the joint will dated April 25, 1911, of her deceased husband, Richard Edgar Clifford Callwood, and herself, and to exercise the authority conferred upon the said Jacob Peiffer by the said joint will and by the applicable law, subject to the further orders of the court.

2. That the defendant, Osmond Kean, and the intervening defendant, Clifford W. L. Callwood, assign, pay over and deliver to the plaintiff the sum of $17,932.50 (less all sums heretofore paid by the defendant to her or for her account thereout), being one-half of the net proceeds of the sale of No. 38 Dronningens Gade, Queen's Quarter, in the town of Charlotte Amalie, remaining after the payment by the defendant of $9,134.99 to retire the existing mortgages on the property and for sale's commissions and other expenses of the sale of the property, and that the remaining one-half, $17,932.51, of the net proceeds of the sale of the said property be assigned by the defendant, Osmond Kean, and the intervening defendant, Clifford W. L. Callwood, to the plaintiff and deposited by them in her name in a bank or banks determined by the guardian appointed by this court for the plaintiff to be withdrawn from the said bank or banks by the plaintiff or reinvested only with the written consent of such guardian and subject to the further orders of the court.

3. That the distribution of the undistributed net proceeds of the sale of No. 38 Dronningens Gade directed by this judgment to be made, shall be made by the assignment or conveyance and transfer of the mortgages and undivided interest in No. 87 Kronprindsens Gade, Charlotte Amalie, in which such net proceeds are now invested and of any uninvested cash, in accordance with a schedule of distribution to be prepared by the defendant and approved by

the court, such schedule to be promptly prepared by the defendant and submitted to the court for its approval.

 Since, although an appeal from the District Court of the Virgin Islands in a case arising under the local law of the islands is a trial de novo,[19] the final judgment must necessarily be entered in the district court, the judgment heretofore entered by the district court will be vacated and the cause will be remanded with directions to enter a judgment in the terms indicated in this opinion.

## On Motion for Rehearing

The plaintiff asks for rehearing of so much of our decision as approves the appointment of D. Victor Bornn as guardian for the plaintiff to succeed Jacob Peiffer, last surviving guardian named in the joint will dated April 25, 1911, of her deceased husband, Richard Edgar Clifford Callwood and herself. She again asserts as she did at the original argument that under the joint will which named Jacob Peiffer and Otto Zwanziger in succession as guardians it was contemplated that the guardianship should continue after the death of the last survivor of these individuals only if the survivor of them in his lifetime transferred his authority to another guardian and that this was never done. Accordingly, she says, the testamentary guardianship lapsed and she strongly urges that under the Danish law it cannot be revived by the district court except on her application. In support of this proposition she cites the excerpt from Bentzon's treatise, Den Danske Arveret, which appears in footnote 15 to our opinion.

 The plaintiff's contention in this regard is without merit. In the first place we think that it is clear from the testator's will that he intended that his widow's retention of their joint estate should be subject to the guardianship contemplated by the Danish law. By naming a guardian,

[19]Clen v. Jorgensen, 3 Cir., 1920, 265 Fed. 120; People of Virgin Islands v. Price, 3 Cir., 1950, 181 F.2d 394.

and a successor guardian and by authorizing the survivor in turn to name his successor the testator took steps which he evidently thought would be adequate to carry out his will in this respect. Certainly there is nothing in the will to indicate any intention on the part of the testator that the guardianship should absolutely terminate if these provisions should fail. He did not exclude the possibility that in such circumstances an appointment might be made by the court.

 In the second place the plaintiff is wrong in thinking that under the Danish law the power of the court to appoint a guardian for a widow remaining in possession of the joint estate of her husband and herself in succession to a testamentary guardian who has died is limited to cases in which the widow applies to the court for such an appointment. Indeed the excerpt from Bentzon's treatise upon which the plaintiff relies itself indicates the contrary by suggesting that the guardianship of a widow in these circumstances is based under the Danish law not only on the needs of the widow but also on those of the living issue. Our examination of the Danish law satisfies us that it authorizes such a guardianship not only for the assistance and potection of a widow who remains in possession of the joint estate, but also for the protection of the testator's children who are excluded from their inheritance during the widow's lifetime. Accordingly in case of the death of a testamentary guardian for a widow the Danish law confers full power upon the court to appoint a successor guardian if the needs of the widow or the living issue require it and this power is not limited to cases in which application for such appointment is made by the widow.

The petition for rehearing will be denied.